Hershel PAYTON, Appellant,

v.

Donna E. SHALALA, Secretary of the Department of Health and Human Services, Appellee.

No. 93–2773.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1994.

Decided June 1, 1994.

Anthony Bartels, Jonesboro, AR, argued, for appellant.

Pamela Wood, HHS, Dallas, TX, argued, for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Hershel Payton applied for disability benefits (DIB) and Supplemental Security Income (SSI) in November 1990 alleging disability due to a work-related back injury. His claim was denied initially and upon reconsideration. Payton requested and was granted an administrative hearing at which he represented himself. The Administrative Law Judge (ALJ) denied Payton's claim and the Appeals Counsel sustained the ALJ's decision. Payton sought judicial review of the denial of his claim in federal district court, and that court affirmed the Secretary's decision and dismissed his claim. He now appeals the district court's decision, and we reverse and remand for further proceedings.

Payton is a 36–year–old male, who has held a variety of jobs in the past, including a tire-recapper, riverboat deck-hand, and oil field derrick-hand. He last worked July 18, 1990, as a mechanic at a service station—a job he was forced to quit after injuring his back while installing an engine.[1] That same day he saw Dr. Floyd Rupp for chiropractic treatment of his back injury. At Dr. Rupp's recommendation, Payton saw Dr. Stephen Eichert, a neurological surgeon, on July 26, 1990, for a comprehensive examination. Payton complained of severe and unremitting back and leg pain that persisted despite the use of muscle relaxants, analgesics, and a brace, and was given a magnetic resonance imaging (MRI) exam of his lumbar spine. Ad.Tr. at 151. The MRI showed evidence of degenerative disc disease and was strongly suggestive of disk herniation at the L4–L5 level. *Id.* 152. Dr. Eichert felt that Payton's condition warranted further investiga-

tion and that a myelography and possibly even surgery would be necessary.

For the next five months or so, Payton saw Dr. Rupp on a regular basis for chiropractic treatment (he saw Dr. Rupp a total of twenty-seven times for spinal manipulation and therapy). On November 8, 1990, he returned to Dr. Eichert complaining of pain primarily in his back. Dr. Eichert prescribed a nonsteroidal anti-inflammatory drug and recommended that he be re-evaluated in one month. *Id.* at 154. On December 10, 1990, Payton saw Dr. Eichert as scheduled, at which time he complained of considerable discomfort. *Id.* at 155. Sitting was "intolerable" for Payton and ambulating "[wasn't] much better." *Id.* Dr. Eichert found that Payton had an acute lumbar radiculitis,[2] and concluded that a myelogram and surgery would be necessary.

On January 16, 1991, Payton was admitted to Tulsa Regional Medical Center where he underwent a lumbar myelogram and post myelogram CT, both of which suggested L4–L5 disk herniation. In view of these findings and Payton's failure to respond to previous therapy, Dr. Eichert performed a hemilaminectomy, medial facetectomy, and diskectomy on Payton. *Id.* at 156. Postoperatively Payton did well. He was scheduled to be re-evaluated by Dr. Eichert on June 17, 1991. *Id.* at 167.

The next—and apparently last—appointment Payton had with a doctor before his administrative hearing was with Dr. Jimmy Martin on May 28, 1991. Dr. Martin examined Payton and found that he showed evidence of "chronic musculoligamentous injury to the low back with sensory nerve root injury affecting the left hip and the left lower extremity." *Id.* at 168. Based on his examination of Payton and Payton's medical history, Dr. Martin concluded that Payton had been "100% temporarily totally disabled from June 18, 1990 until the present and will

---

1. Payton applied for but was denied workers' compensation benefits because his employer was not insured.

2. Radiculitis is an inflammation of the root of a spinal nerve, especially that portion of the root which lies between the spinal cord and the intervertebral canal. *Dorland's Illustrated Medical Dictionary* 1301 (25th ed. 1974).

continue to be 100% temporarily totally disabled pending further treatment and evaluation." *Id.*[3]

Payton appeared before the ALJ without the benefit of counsel on June 5, 1991. He testified that his back continued to hurt him and that the pain in his back and hip was "excruciating" when he sat for more than a brief period of time. *Id.* at 36. He explained that an average day consisted of fixing breakfast for his daughter, visiting with his sister, laying down on the couch, watching TV, reading, and occasionally visiting friends. *Id.* at 37–38. He stated that he planned to return to Dr. Eichert on June 17, as scheduled, for a re-evaluation of his condition. *Id.* at 35.

The ALJ found that Payton's subjective allegations of pain were inconsistent with his medical reports and with the "great deal of physical activity" Payton did on a daily basis, *id.* at 12, and concluded that Payton, although unable to return to his past relevant work, had the residual functioning capacity to perform the full range of light work. *Id.* at 14. He rejected Dr. Martin's report and, based on the lack of other post-operative reports in the record, concluded that Payton did not seek further medical treatment after his operation. *Id.* at 12.

■ The record is sufficiently unclear, we believe, as to whether Payton sought treatment after his surgery—apart from his visit to Dr. Martin—to warrant a finding that he was not disabled for twelve consecutive months (as the ALJ ultimately concluded). Payton clearly was temporarily totally disabled from July 18, 1990, his last day of work, to mid-January 1991 when he underwent back surgery.[4] The question is whether his disability persisted until at least July 18, 1991, the date by which he had to establish disability in order to be entitled to benefits. *See* 42 U.S.C. § 1382c(a)(3)(A). If it

did, he would be entitled to benefits for at least one year. *See* 20 C.F.R. § 404.316; *Harris v. Secretary of DHHS*, 959 F.2d 723, 724 (8th Cir.1992) (a claimant not entitled to continuing benefits may well be eligible to receive benefits for a specific time period).

The only concrete evidence that Payton's disability continued beyond the date of his surgery was Dr. Martin's May 1991 report that Payton was then one-hundred percent temporarily totally disabled and would continue to be disabled pending further treatment and evaluation.[5] Ad.Tr. at 168. In his report, Dr. Martin noted that Payton was then under the care of Dr. Eichert, whom he was scheduled to see on June 17, 1991—two weeks after his administrative hearing. Without waiting for the benefit of Dr. Eichert's evaluation or appointing a consulting physician to examine Payton promptly, however, the ALJ summarily concluded that Payton "had sufficient time in which to recover, and at no time was ... disabled for one consecutive year." *Id.* at 13. The record simply was not sufficiently developed for the ALJ to draw this conclusion.

■ The ALJ has a duty to develop the facts fully and fairly, particularly when the claimant is not represented by counsel. *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir.1981). Where the ALJ has failed to fully develop the record, this court has required the Secretary to reopen the case until the evidence is sufficiently clear to make a fair determination as to whether or not the claimant is disabled. *Id.* (citing *Thorne v. Califano*, 607 F.2d 218, 220 (8th Cir.1979)). The ALJ did not adequately develop the record here.

Accordingly, we reverse and remand the case with directions to allow the parties to

---

3. We assume that Dr. Martin meant July 18, 1990, and not June 18, 1990, as July 18 was Payton's alleged disability onset date (the day he last worked).

4. The ALJ recognized this much, noting in his report and recommendation that Payton "did have [a] severe injury from which [sic] he received an operation." Ad.Tr. at 13.

5. In addition to Dr. Martin's report, there was other evidence—concededly less compelling but

nonetheless worth investigating—that Payton's disability persisted beyond the date of his surgery. Payton testified that at the time of the hearing he had been regularly seeing Dr. Don Barney, a general practitioner, for a month or so. Ad.Tr. at 37. There are no medical records in the record to confirm this. However, Payton stated in a list of prescription medications he submitted prior to the hearing that he was prescribed Amitriptyline on May 15, 1991, by Dr. Barney for pain and Dolobid for the same on June 3. *Id.* at 169.

complete the record with respect to Payton's disability status between January 1991 and July 18, 1991, and in the event Payton is found to be disabled, to determine whether his benefits should be continuing or for a closed period.[6] *See* 20 C.F.R. § 404.316; *Harris,* 959 F.2d at 724.

---

**6.** With regard to Payton's subjective allegations of pain, which the ALJ found were not credible, we note that a claimant need not prove that he or she is bedridden or completely helpless to be found disabled. *See Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). In order to find that a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world. *McCoy v. Schweiker,* 683

F.2d 1138, 1147 (8th Cir.1982) (en banc). The ability to prepare meals for dependents, occasionally visit with family and friends, watch TV, and read does not qualify as the ability to do substantial gainful activity, *see Thomas,* 876 F.2d at 669, and cannot reasonably be characterized as "a great deal of physical activity." *See* Ad.Tr. at 12.

