# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1717

_____

| | | |
|---|---|---|
| Sharon K. Cox, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Kenneth S. Apfel, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: September 25, 1998

Filed: November 23, 1998

_____

Before RICHARD S. ARNOLD, BEAM, and HANSEN, Circuit Judges.

_____

BEAM, Circuit Judge.

Sharon Cox appeals the district court's order affirming an administrative law judge's denial of social security disability benefits. Because the administrative law judge (ALJ) failed to fully consider the ramifications of an implanted morphine pump, and failed to adequately develop the record, there is not substantial evidence to support the ALJ's decision. Accordingly, we reverse and remand for further proceedings.

## I.    BACKGROUND

Sharon Cox is a fifty-two year-old woman with a high school education and a history of depression,  back pain, and arthritis.  Her past relevant work was as a legal secretary until June of 1993.  In November 1985, she slipped and injured her back while at work.  Shortly thereafter, she began to experience pain in her lower back and legs and embarked upon a long search for pain relief.  This search included trying different doctors, tests, drugs, and therapies.  In 1991 and 1992, Cox had three surgeries performed on her lower back to remove two lipoma, repair a herniated muscle, and remove a sac of fluid.  Her pain continued unabated despite the fact that her doctors could find no specific cause.  In April 1993, she was eventually referred to Dr. Chaplick at the Pain Management Center of the Baptist Medical Center.  Dr. Chaplick administered a morphine epidural nerve block which proved temporarily effective.  Based on this success, and on the ineffectiveness of any of her past treatments, Dr. Chaplick recommended the implantation of an intrathecal narcotic infusion pump.[1]  The pump was surgically implanted in early May 1993, and Cox has required ever increasing doses of morphine since that time.

On June 28, 1993, Cox lost her job as part of a forty-five person lay-off at the law firm where she was working.  She applied for, and received, unemployment insurance benefits for approximately the next six months.  In order to qualify for unemployment  benefits, Cox certified that she was able and willing to work.

In July 1993, the pump failed and Cox received epidural injections every other day until the pump was repaired in August.  In October 1994, Cox began to experience

---

[1]An intrathecal infusion pump is a small programmable pump surgically implanted in the patient which delivers a narcotic, in this case morphine, directly into the spinal canal. These pumps are preprogrammed for a particular dosage, but also allow the patient to self-medicate as needed within preset parameters.

pain and swelling in her right leg and swelling in her feet. She was diagnosed with degenerative arthritis and edema, and treated with more pain medication, diuretics, and a sequential gradient pump to push the excess fluid out of her legs. Cox's entire right knee was eventually replaced in March 1995.

Cox applied for disability benefits in November 1993, alleging that she was disabled as of June 28, 1993, by the extreme pain in her lower back and legs, which is aggravated by sitting or standing for more than fifteen to twenty minutes at a time. In December 1993, Cox was examined by an orthopedic surgeon at the request of the Commissioner. Dr. Thomas-Richards recommended a psychological evaluation, and concluded that, although Cox could physically perform sedentary work, her reliability, productivity, and attendance would be marginal due to her dependence on morphine.

Prior to being fitted with the morphine pump, Cox was given a psychological examination to determine her suitability for the procedure. The psychologist who administered the exam, Dr. Montgomery, noted that Cox was depressed, that the depression may exaggerate her perception of pain, and that Cox may use her pain in a manipulative manner. Dr. Montgomery described Cox as being in a "desperate situation" attempting to work in spite of her severe pain, and a high risk for suicide if the pump did not prove effective. Cox's other physicians often noted a probable "psychogenic" or "psychosocial" overlay to her complaints of pain.

In May 1994, Cox's treating physician at the time, Dr. Chaplick, reported that Cox showed signs of depression. He felt that Cox was increasingly tolerant of her medications and that she "may overdo her medications" at times. Dr. Chaplick stated that he was not aware of Cox's concentration situation, but that she did suffer from some memory loss. Nevertheless, he believed she had the mental ability to do some kind of work. He stated that he would like to see Cox reduce the amount of medication and concluded that "if she could learn to tolerate the pain, then she could learn to sustain work activity."

Cox was twice denied disability benefits, and in June 1994, filed a request for a hearing before an ALJ. At the hearing, in September 1995, Cox testified that she had certified her ability to work in order to obtain unemployment benefits, and that she actively sought employment during the six months following her lay-off. She does not drive because the morphine blurs her vision, although she also stated that she can read and watch television. She does not participate in any household chores that require standing or walking. Cox testified that she is unable to work due to constant pain in her back and legs, and swelling in both her legs which requires her to elevate them periodically. She denied any serious mental impairments and stated that she did not feel severely depressed.

The ALJ found that Cox was not disabled. He found that her claims of disabling pain were not credible. He also concluded that her leg pain and edema from arthritis had been controlled. The ALJ relied primarily on the lack of a medically discernable cause for Cox's pain, two doctor's opinions that she could work if she reduced her medications, and the comment that she may use her pain in a manipulative fashion. The ALJ concluded that Cox could perform sedentary work, provided she had the option to sit or stand at will, and is limited to work involving no more than normal stress. The Appeals Council declined to review the case and the district court affirmed. Cox appeals to this court, arguing essentially that the record lacks substantial evidence to support the ALJ's ruling, and that the ALJ failed to develop the record.

## II. DISCUSSION

To determine disability, the Commissioner uses the familiar five-step sequential evaluation. He determines: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is

disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. See Kelley v. Callahan, 133 F.3d 583, 587-88 (8th Cir. 1998).

Our standard of review is a narrow one. We will affirm the ALJ's findings if they are supported by substantial evidence on the record as a whole. See Matthews v. Bowen, 879 F.2d 422, 423 (8th Cir. 1989). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997). However, the review we undertake is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision. See Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir. 1991).

In the last step, the Commissioner has the burden to establish that jobs realistically suited to the claimant's residual functional capabilities are available in the national economy. See Talbott v. Bowen, 821 F.2d 511, 514-15 (8th Cir. 1987). In determining availability of such jobs, the claimant's impairments, together with her age, education, and previous work experience, must be considered. See Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir. 1998). The Commissioner may produce evidence of suitable jobs by eliciting testimony from a vocational expert concerning availability of jobs which a person with the claimant's particular residual functional capacity can perform. See id. This is generally accomplished by posing hypothetical questions to a vocational expert. The questions must fairly reflect the abilities and impairments of the claimant as evidenced in the record. See Morse v. Shalala, 32 F.3d 1228, 1230 (8th Cir. 1994).

In this case, the ALJ asked the vocational expert if there were jobs available for an individual limited to sedentary work, who must have the option to sit or stand, and who cannot tolerate greater than normal stress. The vocational expert responded in the affirmative. As discussed below, the question did not adequately account for Cox's impairments, thus the testimony of the vocational expert cannot be used as substantial evidence that Cox is not disabled. If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. See Greene v. Sullivan, 923 F.2d 99, 101 (8th Cir. 1991). The question posed to the vocational expert was inadequate for two reasons. First, the ALJ improperly discounted Cox's subjective complaints of pain. Second, because the ALJ failed to properly develop the record, there is no way to determine whether the question posed accurately reflected Cox's abilities and limitations.

## A.      Subjective Claims of Disabling Pain

In analyzing a claimant's subjective complaints of pain, an ALJ must examine: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. See id. The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

We question whether a claimant with seven years of medical records detailing repeated complaints of severe pain, who undergoes three back surgeries in the hopes of alleviating that pain, and who now lives with a morphine pump implanted in her body, can be found not credible regarding her complaints of pain.

-6-

In discounting Cox's allegations of pain using the <u>Polaski</u> factors, the ALJ found that there were no objective findings to support the degree of pain alleged, and pointed out that several physicians noted that her pain was out of proportion to the objective findings. This is not reflected in the record as a whole. The ALJ refers to Dr. Thomas-Richards' statement that there are no clinical findings to correlate with Cox's level of pain. However, Dr. Thomas-Richards examined Cox only once and expressly qualified the statement by noting that he had been given no medical records to review. While it is true that physicians have been unable to identify a specific physical cause for the amount of pain claimed by Cox, she has been repeatedly diagnosed with chronic low back pain and depression which cause her to feel exaggerated levels of pain. Depression, diagnosed by a medical professional, is objective medical evidence of pain to the same extent as an X-ray film. <u>See</u> 20 C.F.R. §§ 404.1508, 404.1528. Another objective medical fact supporting Cox's subjective complaints of pain is the consistent diagnosis of chronic lower back pain, coupled with a long history of pain management and drug therapy, including the implantation of the intrathecal morphine pump. It is obvious that physicians have determined Cox was experiencing great pain. <u>See</u> <u>Bakalarski v. Apfel</u>, No. 97-1107, 1997 WL 748653 (10th Cir. Dec. 3, 1997) (consistent diagnosis of chronic pain syndrome can serve as an objective basis for pain).

The ALJ also relies on two physicians' comments that Cox may be able to engage in substantially gainful activity, and concludes that Cox is capable of some type of work with "medication even at current levels." However, this conclusion is not supported by the record for two reasons. First, both of the physicians' comments were conditional, based either on decreased morphine levels, or an increased ability to tolerate pain. Second, Cox was no longer taking the same dosage of morphine that she was at the time of the physicians' comments. Cox's morphine dosage has steadily increased ever since the pump was surgically implanted. In September, she was receiving 3.6 mg/day. When she was evaluated by Dr. Thomas-Richards in December 1993, she was receiving 6.2 mg/day. In January 1994, the dosage was again increased

to 7.6 mg/day. In July 1994, shortly after Dr. Chaplick suggested she may be able to work if she could learn to tolerate the pain, the dosage was 8.9 mg/day. Shortly thereafter, her dosage was nearly doubled by her new physician. By the time of the hearing, she was receiving 25 mg/day of morphine, the point at which additional amounts of the drug prove ineffective. There is nothing in the record to indicate that the ALJ knew what Cox's dosage was at the hearing, or what the effects of the drug may be at that level.

The ALJ also points out that Dr. Chaplick felt Cox should cut down on the amount of morphine she uses. The suggestion is that if the morphine interferes with Cox's ability to work, it is due to Cox's choice and not to any impairment. While we do not question a medical opinion, we point out that it seems a bit disingenuous to surgically implant a device which injects an addictive narcotic directly into a patient's spine, and then suggest that the patient should use less of the drug. This is especially true in regard to drugs such as morphine where the body develops a tolerance to the drug, thus requiring greater doses to achieve the same effect. See Physicians' Desk Reference 987 (51st ed. 1997). Cox is dependent on the morphine. The addiction is caused by the nature of the drug prescribed. Because Cox is dependent and the doctor controls both the programming and refilling of the pump, Chaplick had as much control over the amount of morphine Cox used than Cox herself.

The ALJ also relies on two inconsistencies between Cox's testimony and the record. He first points out that Cox lost her job as part of a large lay-off and not because of her impairments. In some circumstances, this allows the inference that the claimant was able to work, and therefore not disabled, at the time of her alleged onset of disability. See Black, 143 F.3d at 387. However, unlike the facts in Black, Cox's lay-off coincided with the surgical implantation of the infusion pump, and closely followed a period during which Cox required repeated trips to the hospital for epidural injections of morphine. In this case, the fact that Cox was laid off, and did not quit

because of her impairment, does not amount to an inconsistency so striking as to negate Cox's subjective claims of pain.

The second inconsistency relied on by the ALJ to negate Cox's credibility is her acceptance of unemployment benefits for the period immediately following her lay-off. We have held that the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability. See Salts v. Sullivan, 958 F.2d 840, 846 n.8 (8th Cir. 1992). However, the negative impact cannot be uniformly or automatically applied in every case. Where, as here, there is no other evidence to detract from the claimant's credibility, the negative inference is not sufficient, of itself, to negate the claimant's credibility. See id., see also Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991).

## B.    Duty to Develop the Record

Many of the inadequacies of the ALJ's decision flow from his failure to develop the record. The administrative hearing is not an adversarial proceeding. See Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). The ALJ has a duty to develop facts fully and fairly, and this duty is enhanced when the claimant is not represented by counsel. See Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994). The record presented is inadequate for the purpose of determining whether Cox is disabled.

We have found no circuit court disability opinion involving a claimant dependent on morphine for pain control. Morphine is the drug of last resort for long term pain management because of its addictiveness and the patient's eventual tolerance, requiring ever increasing levels of the drug. See, e.g., The Merck Manual 1407-15 (16th ed. 1992). It is most often used to control pain after surgery. Because of the patient's eventual tolerance and addiction to the drug, long term use of morphine for pain control in continuous intrathecal infusion devices is generally recommended only for terminally ill cancer patients. See id., Physicians' Desk Reference at 985-87. No determination

-9-

regarding disability can be made without an investigation into the impact of the patient's dependence and the side effects of increasing doses of the drug. Neither were addressed in the ALJ's opinion. The fact that Cox is dependent on ever-increasing doses of morphine was never acknowledged or discussed, even though there is ample evidence in the record of the increasing dosages, and of Cox's dependence on the drug. At the hearing, the ALJ asked only one question about the side effects of Cox's medications. Cox responded that her vision was blurred. Although several of the medical reports indicated a relationship between the morphine and Cox's mental abilities and her ability to work, the ALJ never developed or explored this aspect of the case. We find no effort to fully and fairly develop the record.

The need to more fully develop the record is also shown by the absence of some medical reports. The record contains 117 pages of reports from the pain management clinic. Eleven of those reports are for visits to the clinic or emergency room between September 1993 and April 1994, to receive an additional epidural of morphine and/or to have Cox's pump reprogrammed. There are no similar records for the seventeen months prior to the hearing, despite the fact that a letter from Dr. Charapata, dated August 1995, makes clear that Cox has been under the care of the Pain Institute since July 1994, and continues to require increases in her morphine dosage.

Similarly, the record contains medical reports detailing Cox's knee replacement operation in March 1995, but is devoid of any evidence concerning her recovery or the success of post-operative physical therapy. Cox testified that she suffered from pain and swelling in her feet and legs. The ALJ dismissed these claims, stating that exhibit 48 demonstrated that the condition had been brought under control with medication. Exhibit 48 contains the medical reports detailing the diagnosis and treatment of edema, most likely caused by rheumatoid arthritis. The last entry was made in December 1994. While these records do show the prescription of drugs and pneumatic boots, there is no indication that the symptoms were brought under control. Even if the exhibit could be interpreted as the ALJ suggests, there is no evidence of the level at which the

symptoms are now "under control." The ALJ cannot rely on the absence of later records dealing with the same subject as an indication that the medical condition has been resolved. In this case, the record shows that Cox's right knee was replaced three months later. Any conclusion that Cox was no longer having trouble with her legs is obviously unwarranted.

During the hearing, the ALJ asked Cox if the record was complete. Cox replied, "To my knowledge, yes." The Commissioner cites <u>Mitchell v. Shalala</u>, 25 F.3d 712 (8th Cir. 1994), for the proposition that the ALJ was entitled to rely on Cox's response. In <u>Mitchell</u>, the claimant testified that he had completed the eighth grade and could read. Because there was nothing in the record inconsistent with that statement, the ALJ was entitled to rely on the claimant's statement and did not have a duty to develop the record further in that regard. <u>See</u> <u>id.</u> at 715. The present facts are easily distinguishable from <u>Mitchell</u>. Here, it is obvious that the record did not contain all the relevant medical records, including the last seventeen months of records from Cox's personal physician charged with her pain management. And since the record clearly did not contain enough evidence to adduce the impact of Cox's morphine dependence on her ability to work, or whether Cox still suffered from edema, the ALJ's failure to develop the record more fully is reversible error.

## III. CONCLUSION

This case is close on the issue of whether we would simply reverse with instructions to award benefits. However, due to our abundant deference to the ALJ, we feel it appropriate that the ALJ be given the opportunity to more fully develop the record. Accordingly, the judgment is reversed and remanded to the district court with directions to remand it to the Commissioner for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.