# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-2058

_____

ROBERT TATE,                              *
                                          *
           Plaintiff-Appellant,           *
                                          *   Appeal from the United States District
                                          *   Court for the Eastern District of
           v.                             *   Arkansas.
                                          *
                                          *
KENNETH APFEL, Commissioner,              *
Social Security Administration,           *
                                          *
           Defendant-Appellee.            *

_____

Submitted: November 20, 1998
Filed: February 9, 1999

_____

Before RICHARD S. ARNOLD, FAGG, and HALL,[1] Circuit Judges.

_____

HALL, Circuit Judge.

Robert Tate appeals the district court's affirmance of the Administrative Law Judge's ("ALJ") decision denying his request for disability insurance benefits and supplemental security income. The district court had jurisdiction to review the final decision of the Commissioner of the Social Security Administration pursuant to

_____

[1] The Honorable Cynthia Holcomb Hall, United States Circuit Judge for the Ninth Circuit, sitting by designation.

42 U.S.C. § 405(g). We have jurisdiction to review the decision of the district court pursuant to 28 U.S.C. § 1291, and we reverse.

## I.

Robert Tate applied for disability benefits based on his seizures, high blood pressure, and nervousness. The ALJ found that while Tate suffered from seizures, hypertension, nervousness, anxiety, depression, and headaches, he retained the residual functional capacity to perform unskilled, light work. On appeal, Tate focuses his challenges to the ALJ's ruling that he did not suffer from epilepsy or severe seizures.

Tate had previously applied for disability benefits because of his seizures. An ALJ rejected his application on November 22, 1991, in part because of evidence in the record that Tate did not lose consciousness during his seizures, the seizures occurred less than once a month despite below-therapeutic levels of convulsive medications in Tate's bloodstream, the seizures did not involve psychomotor movements, and because the seizures may have been related to drug withdrawal.

In the instant case, the ALJ expressly considered all medical evidence, regardless of its date, to the extent that it was relevant in evaluating Tate's current disability status.[2] Records entered into evidence from Tate's prior disability proceedings established that Tate experienced a grand mal seizure[3] on November 2, 1989, while hospitalized for a depressive illness under the care of Dr. Randall

---

[2] It was proper for the ALJ to consider the evidence from the prior administrative hearing in this second, separate proceeding. See Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n.6 (8th Cir. 1993) ("Evidence from the record of a prior claim may be relevant to a claim of disability with a later onset date.").

[3] We have previously explained that "[a] grand mal seizure is characterized by a loss of consciousness with generalized tonic-clonic seizures. A tonic-clonic seizure is a spasm consisting of a convulsive twitching of the muscles." Flanery v. Chater, 112 F.3d 346, 347 n.2 (8th Cir. 1997) (citation omitted).

Moskovitz. An electroencephalogram ("EEG")[4] conducted on November 6, 1989, apparently did not reveal any abnormalities in Tate's brain functioning. However, an EEG conducted under sleep-deprived conditions on November 7, 1989, was characterized as "abnormal." Dr. Evelyn Ogle, the electroencephalographer, indicated that the second EEG could be consistent with Tate's recent seizure episode, but noted that the "underlying pathology cannot be determined by the EEG alone." A neurologist, Dr. Srinath Bellur, first prescribed Dilantin, an anti-convulsant, to control Tate's seizures on November 20, 1989. Tate apparently suffered a second seizure on December 11, 1989.

Records from Dr. Chanh Van Huynh, Tate's treating physician, indicate that Tate reported having six seizures from October, 1989, through October 18, 1990. Dr. Van Huynh reported observing one of Tate's seizures, which involved a loss of consciousness, disorientation, myalgia,[5] and tiredness that would last up to six hours. Dr. Van Huynh increased Tate's Dilantin levels in response to the below-therapeutic levels of the drug in Tate's blood stream and additional reports of seizures.

On January 4, 1991, Dr. David Loe, a psychologist, reported that Tate "likely exaggerates his symptoms for secondary gain." Dr. Loe also stated that Tate's wife described Tate's seizures as not involving any loss of consciousness, and not including any psychomotor reactions. On August 31, 1991, Dr. Gerald Fowler, a psychiatrist, evaluated Tate's condition. Among other findings, Dr. Fowler noted that medications such as Depakote and Tegretal might be able to better control Tate's seizure disorder, but that Tate's current financial situation precluded such treatments. The ALJ in the prior disability proceeding rejected Dr. Fowler's opinion in its entirety, in large part because "Dr. Fowler invariably finds social security claimants to be disabled." Another examining psychiatrist, Dr. B. Eliot Cole, suggested on

---

[4] An EEG "measures the electrical conduction capacity of the brain." Delrosa v. Sullivan, 922 F.2d 480, 483 n.3 (8th Cir. 1991)

[5] Myalgia is a term that refers to muscular pain. See Stedman's Medical Dictionary 1009 (25th ed. 1990).

3–

January 9, 1992, that more modern anti-convulsants instead of Dilantin should be considered to control Tate's seizures.

Additional medical records and reports were submitted at Tate's second disability hearing, which is the subject of this appeal. Dr. Charles Swingle, a treating physician, submitted a report dated December 20, 1993, explaining that Tate suffered from approximately two grand mal seizures a week. In addition, a neurologist, Dr. Michael Deshazo, examined Tate in January of 1994, apparently at the request of the Social Security Administration. Dr. Deshazo reported on January 24, 1994, that Tate suffered from a seizure disorder based on his history, but noted that no real workup had been conducted to assess the severity of Tate's condition since Tate's abnormal EEG in 1989. Dr. Deshazo found at that time that Tate's "seizures are apparently uncontrolled," and opined that Tate "could benefit from a more comprehensive evaluation of his epilepsy." Dr. Deshazo also stated that Tate may benefit from new medications or an adjustment in his current medications. An additional note from Dr. Deshazo on January 25, 1994, stated that Tate's Dilantin and Phenobarbital levels were still below the therapeutic range, despite an increase in his Dilantin dosage, and suggested that increasing these medications to their therapeutic level "might also be of help in controlling [Tate's] . . . seizure disorder."

Tate himself testified at the second administrative hearing. Tate explained that he was thirty-six years old, and that he had left college after three years because of financial troubles. Tate claimed that his seizures had increased in frequency since his last administrative hearing, and that he now suffered from two to three seizures a week, which were not controlled by his medications. He also stated that he suffered from a nervous disorder with depression, and that he became nervous around crowds. Tate's daily activities consisted of waking up at 7:00 a.m. and going to his mother's house with his children. His mother, Linda Tate, would look after him and he would assist her with the dishes, making the bed, and vacuuming. While Tate stated that he watched television, he did not read because he could not concentrate. Tate testified that he had no problems relating to family members and neighbors. Tate would only drive once every two weeks because of a fear that he would have a seizure and get

into an accident. Mr. Tate went to sleep each night at around 9:00 p.m. In addition to his testimony, Tate's disability report also emphasized that he suffered from hypertension and constant headaches.

Tate's wife, Barbara Tate, also testified at the hearing. Mrs. Tate submitted a statement that as of December 18, 1993, she had witnessed Tate have thirty-five seizures, observing two in the previous month. Twenty-five of these seizures had occurred during the past year. Mrs. Tate testified that Tate would be unconscious or unaware of what was going on around him for approximately fifteen or twenty minutes following a seizure, and that it would take up to two-and-a-half hours for Tate to fully recover from an episode. Mrs. Tate further verified that Tate regularly took his prescribed medication.

Tate's friend, Orval Shockley, also testified at the hearing, and filed a report on December 16, 1993, stating that he had observed Tate have six seizures in 1993. In addition, Tate's mother filed a written statement on December 18, 1993, averring that she had observed her son have a total of thirty seizures, the last two occurring in November, 1993. She estimated that Tate had suffered between nineteen and twenty seizures in the past year.

The ALJ found that Tate satisfied the requirements of the Social Security disability insured status and that he had not engaged in substantial gainful activity since the alleged onset date. But while he found that Tate suffered from seizures, hypertension, nervousness, anxiety, depression, and headaches, he found that these ailments did not meet or equal a listed impairment under relevant Social Security regulations. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1998). In reaching this decision, the ALJ generally discounted the credibility of Tate's family members and friend because their testimony was "based upon an uncritical acceptance of the claimant's complaints; and, to some degree is motivated by the desire to see [Tate] . . . obtain benefits." The ALJ also rejected Tate's subjective reports of pain because of a lack of objective medical findings, Tate's poor work record, Tate's daily activities, the fact that Tate could control his seizures with medication, the fact that

5–

Tate has not sought out medical treatment, and a finding that Tate exaggerated his symptoms.

The ALJ found that while Tate could not perform his past relevant work, which included positions as a laborer, warehouse worker, route driver/loader and unloader, truck driver, and security guard, Tate retained the residual capacity to perform unskilled, light work. The ALJ relied on the testimony of a vocational expert, Dr. Vance Sales, to reach this conclusion.

The appeals council denied Tate's request for review on October 9, 1996, and the district court affirmed on March 31, 1998.

II.

We must affirm the ALJ's decision if it is "supported by substantial evidence on the record as a whole." See Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. at 1206-1207. Importantly, in conducting our review of the record, "we also take into account whatever in the record fairly detracts from [the ALJ's] . . . decision." Id. at 1207. "We may not reverse the Commissioner merely because substantial evidence exists supporting a different outcome." Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. See 20 C.F.R. § 404.1520(a) (1998); Cox, 160 F.3d at 1206. If the claimant suffers from impairments that meet or equal a listed impairment in the regulations, the claimant is presumptively "disabled without regard to age, education, and work experience." Cox, 160 F.3d at 1206.

Tate claims that he satisfies the requirements of the listed impairment of epilepsy. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (1998).[6] The ALJ found

---

[6] Section 11.02 states:
Epilepsy–major motor seizures, (grand mal or psychomotor),

6–

that Tate's impairments did not qualify under the Social Security Administration's listings because his impairments were not sufficiently severe. The ALJ did not discuss his reasons for discounting the severity of Tate's seizures until he examined whether Tate retained the residual capacity to perform Tate's past work or other jobs in the economy. We find, however, that these conclusions regarding the severity of Tate's seizures are not supported by substantial evidence in the record as a whole. We cannot ascertain on this record whether the ALJ correctly characterized the severity of Tate's seizures, let alone whether Tate satisfies the requirements of section 11.02.

In denying Tate's claim, the ALJ discredited Tate's complaints of disabling seizures. We have held that "[w]hen assessing the credibility of a claimant's subjective allegations of pain . . . the ALJ must consider the claimant's prior work history; daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). "'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" Jackson v. Apfel, 162 F.3d 533, 538 (8th Cir. 1998) (quoting Porch v. Chater, 115 F.3d 567, 572 (8th Cir. 1997)). Here, the ALJ engaged in this analysis, but we do not agree that the record supports his conclusions.

First, the ALJ noted in passing that Tate had a poor work record, but only stated that this fact did not add to Tate's credibility. Second, the ALJ found that

---

documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:
  A.   Daytime episodes (loss of consciousness and convulsive seizures) or
  B.   Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (1998) (emphasis removed).

Tate's daily activities conflicted with his claims of total disability. The ALJ relied on the fact that Tate drives once every two weeks, often helps wash dishes, makes the bed, vacuums, and stays at his mother's house when she looks after his children. Based on these activities, the ALJ determined that "Tate appears to function at a largely normal level on a daily basis with the single exception that he does not engage in gainful work activity."

But these activities are not inconsistent with seizures occurring twice a week and severe headaches. Initially, Tate's wife testified that Tate does not always complete these housekeeping tasks. More importantly, we have explicitly held that claimants may have a disabling seizure disorder and still be able to perform some daily home activities. See Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) (finding that while seizures "may not be totally disruptive in a home environment, [they] . . . could hardly be accommodated in the workplace."); see also Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.") (internal quotations omitted); Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991) ("an applicant need not be completely bedridden . . . to be considered disabled.") (internal quotations omitted) (alteration in original).

Third, the ALJ considered the location, duration, frequency, and intensity of Tate's alleged pain. While noting that Tate claimed to have headaches lasting up to four hours and uncontrolled seizures, the ALJ found that Tate's seizures could be managed by medication. In reaching this determination, the ALJ relied on Dr. Deshazo's report. But Dr. Deshazo's report only stated that increasing Tate's medications to the therapeutic level "might also be of help in controlling his seizure disorder." In addition, Dr. Deshazo opined that Tate "might also be a candidate for one of the newer medications." These are far from resounding endorsements that Tate's seizures would definitely, or even probably, be controlled by medication. Indeed, Dr. Deshazo found that Tate should undergo "a more comprehensive

evaluation of his epilepsy" and that he might require "some in-patient monitoring off the medication to determine his exact seizure type."

Fourth, the ALJ considered precipitating and aggravating factors, and found that no doctor had claimed that Tate would be disabled if he maintained the proper therapeutic levels of medication. This conclusion ignores the fact that Tate has apparently never been at the therapeutic level of medication. The ALJ did not claim that Tate did not take his medication, and nothing in the record suggests that he has failed to do so. Thus, there is no evidence in the record to support the ALJ's supposition that Tate could achieve therapeutic levels of medications in his system, let alone that these levels would then control his seizures.

Fifth, the ALJ considered the type, dosage, effectiveness, and side effects of the medications taken by Tate. The ALJ's analysis of this issue relied on many of the same factors the ALJ relied on in evaluating a sixth subject, Tate's functional limitations. In finding that these factors reduced Tate's credibility, the ALJ again relied on the fact that Tate had never had the therapeutic level of medications in his system. The ALJ noted that Tate had pursued neither emergency nor other forms of treatment to the degree that one would expect if his claims of severe pain were actually valid. The ALJ commented on Tate's failure to verify his seizures with EEG's, adjust his medications, or follow the advice of Dr. Deshazo, who examined Tate at the Social Security Administration's request, to pursue suggested tests to better evaluate the nature of his seizures. These findings contributed to and were compounded by the general lack of objective medical evidence substantiating Tate's claims of illness.

It is true that, "[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem." Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995). It is also true that Tate's attempts to excuse his failure to pursue more aggressive treatment cannot be wholly excused due to his claims of financial hardship. See Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of

her poverty); Hutsell v. Sullivan, 892 F.2d 747, 750 n.2 (8th Cir. 1989) (noting that "lack of means to pay for medical services does not ipso facto preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).

Nevertheless, as Shannon itself notes, consideration of this factor is not controlling. This statement is especially true on the facts of this case. No medical report suggests that Tate has not been pursuing a valid course of treatment for his seizures since 1989. No medical doctor has questioned the severity of Tate's seizures. Indeed, descriptions of Tate's seizures by doctors suggest that they are at least on occasion extremely severe. The ALJ noted that Dr. Swingle had described Tate's seizures as involving "tongue biting, loss of consciousness, urination or fecations, alteration of awareness, postictal antisocial behavior, and convulsive seizure."[7] Dr. Deshazo thought that the seizures appeared to be of a sufficient magnitude as to preclude Tate from holding "any type of employment." At the very least, one cannot say that "the medical records do not reveal that appellant complained of disabling seizures and headaches or requested treatment." Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). These findings were only corroborated by the testimony of Tate's wife, mother, and friend.[8]

A psychologist, Dr. Loe, did suggest that Tate might be exaggerating his symptoms. But Dr. Deshazo, a neurologist, recommended further tests to better evaluate the nature of Tate's seizures, especially because the results of the abnormal EEG in 1989 were inconclusive and remote in time. To the extent that this examining neurologist recommended further tests that were not conducted, the ALJ may have

---

[7] Postictal refers to the period following a seizure. See Stedman's Medical Dictionary 1245 (25th ed. 1990).

[8] We note that the ALJ properly discounted the testimony of these lay witnesses based on their incentive to see Tate obtain benefits and an uncritical acceptance of Tate's complaints. See Ownbey v. Shalala, 5 F.3d 342, 344 (8th Cir. 1993) (per curiam). But the testimony of these witnesses only emphasizes the lack of evidence in the record discounting Tate's claims of seizures.

failed in his duty to adequately develop the record. See Delrosa, 922 F.2d at 485 n.5; see also Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (noting duty of ALJ to order additional tests when "the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").

In evaluating Tate's functional limitations, the ALJ also rejected Tate's claim that he was unable to concentrate because Tate had attended college for three years and quit only because of financial difficulties. In addition, the ALJ discredited Tate's allegations of reading problems because he did not seek treatment for this ailment. The ALJ also rejected Tate's testimony that Tate did not like to be around crowds and did not attend social events because he related well to his family members and had one friend that he brought with him to the hearing. These findings largely relate to Tate's alleged mental impairments, which are not really at issue in this appeal. But to the extent that they are relevant, they are far from dispositive. According to Tate's uncontroverted testimony, he ceased attending college over ten years before his seizures, and his related concentration problems, began in 1989. Tate's ability to get along with family members does not discredit his testimony as to his ability to deal with strangers and friends, especially because Tate merely testified that he would get nervous around friends and strangers. Tate's friend, Orval Shockley, verified that Tate really only left the house to see doctors, and that very few people ever came to visit him. Finally, Tate's failure to seek medical attention for his reading difficulties cannot be said to affect directly his claims of seizures.

As a result, substantial evidence does not support the ALJ's determination that Tate's seizures were not sufficiently severe to qualify under the listings or to be otherwise disabling.[9] No medical evidence supports the ALJ's conclusion that Tate's

---

[9] This action could also be reversed on the grounds that the hypothetical question posed to the vocational expert by the ALJ did not adequately account for Tate's alleged seizures. The hypothetical only referred to Tate's seizures to the extent that it stated that Tate "would have to work in an environment that would not permit him to be at any unprotected heights or around moving equipment or dangerous machinery, nor carrying firearms." Because we find that the ALJ's determination that

11–

seizures would actually be controlled by medication or explains why Tate consistently had below-therapeutic levels of the anti-convulsants in his system. In addition, the ALJ improperly discounted Tate's testimony regarding his seizure disorder. The ALJ must develop the record further to determine whether Tate's seizures are actually disabling. See Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994) (requiring the record to be developed to the point where "the evidence is sufficiently clear to make a fair determination as to whether or not the claimant is disabled.").

Tate argues that the court should grant him disability benefits on this record because he meets the requirements of section 11.02 for epilepsy. He points to the abnormal EEG from 1989, and testimony and reports that support his claims that his seizures are sufficiently frequent and severe. We are not persuaded by the outdated EEG and the current evidence in the record that Tate is in fact correct. Our holding today by no means suggests that Tate is entitled to disability benefits outright. It may well be that on further development of the record, EEG's, other tests, medical reports, or changed doses of medication will support the ALJ's initial conclusion that Tate's seizures are not sufficiently severe to qualify as a listed impairment or to support any other finding of disability.

### III.

We therefore reverse the decision of the district court. The district court should remand the case to the Social Security Administration. On remand, the ALJ should develop the record more fully to better ascertain the nature and severity of Tate's seizures, and to determine whether the seizures may be controlled by medication.

REVERSED and REMANDED.

---

Tate's seizures only minimally affected Tate's ability to work is not supported by substantial evidence in the record, we cannot say that the hypothetical question adequately included all of Tate's impairments. See Cox, 160 F.3d at 1207.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.