**Gerrit H. WIEKAMP, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, in his official capacity, Defendant.**

**No. C99–4083MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Sept. 29, 2000.

Dennis J. Mahr, Sioux City, Iowa, for Plaintiff.

Martha A. Fagg, Asst. U.S. Atty., Sioux City, Iowa, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING JUDICIAL REVIEW OF ADMINISTRATIVE DENIAL OF SOCIAL SECURITY DISABILITY BENEFITS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059
 A. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059
 B. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059
II. *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 A. *Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 1. *"Substantial evidence on the record as a whole"* . . . . . . . . . . . . . . . . . . . . 1061
 2. *Additional evidence not before the ALJ* . . . . . . . . . . . . . . . . . . . . . . 1061
 B. *Disregard Of Opinions Of Treating Physicians* . . . . . . . . . . . . . . . . . . . . . . . . . 1062
 1. *Contentions of the parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1062
 2. *Weight of treating physicians' opinions* . . . . . . . . . . . . . . . . . . . . . . . 1063
 3. *Was the treating psychiatrist's opinion properly disregarded?* . . . . . . . . 1064
 a. *General misapprehension of the record* . . . . . . . . . . . . . . . . . . . . . . . . 1064
 b. *The 12.02 diagnosis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1067
 c. *The 12.06 diagnosis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1068
 d. *The 12.04 diagnosis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1069
 C. *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1073
 1. *The first hypothetical question* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1074

2. *The second hypothetical question* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1075
3. *Which hypothetical question properly reflects Wiekamp's impair-
 ments?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1076
III. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1077

How much weight must be given to a treating physician's conclusions about a claimant's disability for purposes of determining entitlement to Social Security disability benefits? That question is at the center of this judicial review of an administrative law judge's denial of Social Security disability benefits to a claimant asserting a disability caused by depression and post-polio syndrome. Had the administrative law judge (ALJ) given proper weight to a treating psychiatrist's opinion, the claimant contends, the ALJ would have found the claimant suffered from a "listed" disability, or, at the very least, that the claimant suffered from a combination of impairments that precluded him from any jobs available in significant numbers in the national economy. The Commissioner contends, however, that the ALJ's decision to disregard the treating psychiatrist's opinions as well as the ALJ's finding of no disability are both supported by substantial evidence.

## I. INTRODUCTION

### A. Factual Background

Plaintiff Gerrit H. Wiekamp, who was born on June 4, 1950, was hospitalized with polio in 1953. The disease affected his back muscles and, as a consequence, he has avoided occupations involving regular heavy lifting. Instead, he worked for over ten years as a grain elevator manaer and then, for nearly ten years, as a manager of a livestock sales barn. Wiekamp suffered an episode of serious depression in 1978 and another episode in 1985 and 1986. During the second episode, Wiekamp was off work for approximately a year, during which time he received substantial mental health treatment. It was after this second episode of depression that Wiekamp began his employment with the livestock sales company, as a partner and manager of one of its three sales barns, hoping that the job would be less stressful than his employ-

ment with the grain elevator. As a manager of the sales barn, Wiekamp supervised 20 to 25 employees and generally worked 60 to 70 hours a week. However, in early 1996, Wiekamp was suffering from stress, fatigue, and depression that were sufficiently serious that he felt compelled to quit working on March 28, 1996. Wiekamp officially quit his job as manager of the sales barn on April 1, 1996, under an agreement with his partners to step down and be "bought out" of the partnership.

In the spring of 1996, Wiekamp was treated first by his family physician, Dr. Elkjer, then by Dr. Bandettini, a psychiatrist, both of whom diagnosed him as suffering from depression and post-polio syndrome. Wiekamp filed applications for Title II disability insurance (DI) and Title XVI supplemental security income (SSI) benefits with the Social Security Administration on June 17, 1996, asserting a disability beginning on March 28, 1996, owing to depression and post-polio syndrome.

### B. Procedural Background

Wiekamp's applications for Social Security disability benefits were denied initially and on reconsideration. Wiekamp then requested and received an administrative hearing before an Administrative Law Judge (ALJ). At the administrative hearing on October 31, 1997, Wiekamp was represented by counsel he had retained on April 17, 1997. In a decision filed on May 12, 1998, the ALJ again rejected Wiekamp's application, concluding as follows:

> After giving careful consideration to all the evidence, the Administrative Law Judge has concluded that the claimant is unable to perform past relevant work. However, he is able to make an adjustment to other work which exists in significant numbers in the national economy. This conclusion is based on findings concerning his age, education, work experience, and residu-

al functional capacity. For this reason, he is not under a disability, as that term is defined in the Social Security Act and regulations. As the claimant is not disabled, he is not entitled to receive Disability Insurance Benefits based on his application of June 17, 1996. Moreover, Mr. Wiekamp is ineligible to receive Supplemental Security Income payments based on his application filed on June 17, 1996.

ALJ's Decision at 2 (Transcript at 15).

On July 10, 1998, Wiekamp filed a request for further review of the ALJ's decision by the Social Security Appeals Council. Wiekamp submitted additional, post-hearing evidence to the Appeals Council on July 10, 1998, which was received by the Appeals Council and made part of the record. Wiekamp submitted more post-hearing evidence on October 16, 1998, but that evidence never became part of the record. The Appeals Council denied Wiekamp's request for further review on June 25, 1999, which made the ALJ's decision the "final decision" of the Commissioner.

This matter is now before the court pursuant to Wiekamp's August 26, 1999, complaint for judicial review, under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), of the denial of his applications for Social Security disability benefits. Wiekamp contends that he suffers from depression and post-polio syndrome, which result in either a "listed" disability or a combination of impairments that make him unable to perform either his past relevant work or other jobs in significant numbers in the national economy, and that he is therefore disabled within the meaning of the Social Security Act. Wiekamp contends that the Commissioner erred in reaching a contrary conclusion. Specifically, in this action for judicial review, Wiekamp asserts four grounds for overruling the ALJ's denial of benefits: (1) the ALJ improperly rejected the opinions of Wiekamp's primary treating physicians; (2) the ALJ erred by failing to adopt the vocational expert's opinion, on one hypothetical question, that Wiekamp could not perform any

jobs available in significant numbers in the national economy, instead adopting the vocational expert's contrary opinion, on another, improper hypothetical question, that Wiekamp was able to perform certain available jobs; (3) the ALJ improperly failed to order hearing tests regarding Wiekamp's claim of tinnitus; and (4) the evidence demonstrates that Wiekamp meets depression listing 12.04A and is therefore disabled. The court will consider these contentions as necessary.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Before considering Wiekamp's grounds for overruling the ALJ's decision, the court must first survey the standard for judicial review of the Commissioner's denial of an application for Social Security disability benefits. The role of the courts in such a review "is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir.2000); *accord Wheeler v. Apfel*, 224 F.3d 891, 893–94 (8th Cir.2000); *Burnside v. Apfel*, 223 F.3d 840, 843–44 (8th Cir.2000); *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir.2000). As the Eighth Circuit Court of Appeals recently explained,

> Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *See Cox v. Apfel*, 160 F.3d 1203, 1206–07 (8th Cir.1998). In determining whether existing evidence is substantial, we consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

*Singh*, 222 F.3d at 451; *Wheeler*, 224 F.3d at 893–94; *Burnside*, 223 F.3d at 843–44; *Cunningham*, 222 F.3d at 500. Thus, under this standard of review, the court "may not reverse the Commissioner's decision merely because substantial evidence exists

in the record that would have supported a contrary outcome," *Wheeler,* 224 F.3d at 894, "or because [the court] would have decided the case differently." *Burnside,* 223 F.3d at 843. Rather, "[t]he court is required to review the administrative record as a whole, considering evidence which detracts from the Commissioner's decision, as well as that which supports it." *Wheeler,* 224 F.3d at 894; *Burnside,* 223 F.3d at 843.

### 1. "Substantial evidence on the record as a whole"

■ The Eighth Circuit Court of Appeals has explained in more detail how a court is to determine whether the ALJ's findings "are supported by substantial evidence on the record as a whole":

In *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987), the Court discussed the difference between "substantial evidence" and "substantial evidence on the record as a whole." "Substantial evidence on the record as a whole" wrote then Chief Judge Lay, "requires a more scrutinizing analysis" than the "substantial evidence" test. The Court went on to say:

In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. *See Steadman v. Securities and Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981). It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.

*Gavin v. Heckler,* 811 F.2d at 1199. In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

*Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998); *accord Rankin,* 195 F.3d at 428 ("We also evaluate whatever evidence contradicts the Commissioner's decision, rather than simply searching the record for supporting evidence."). Thus, this court must undertake a "scrutinizing analysis" of the evidence in the record as a whole in this case.

### 2. Additional evidence not before the ALJ

In this case, Wiekamp submitted additional evidence to the Appeals Council that was not presented to the ALJ. The Eighth Circuit Court of Appeals recently explained the effect of such additional evidence as follows:

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. *See Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). [Where] the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion ... we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence,

supports the ALJ's determination. *See Nelson*, 966 F.2d at 366.

*Cunningham*, 222 F.3d at 500.

■ In Wiekamp's case, the Appeals Council denied further review after receiving some additional evidence and making it part of the record. *See* Transcript at 6. The additional evidence made part of the record, which appears in the transcript at pages 417–26, consists of Wiekamp's counsel's brief in support of Wiekamp's administrative appeal and pages 176–80 of the "Listing of Impairments for Adults," which concern evaluation of the "late effects" of poliomyelitis. This additional evidence will be considered in this court's "substantial evidence" review. *See Cunningham*, 222 F.3d at 500.

■ However, Wiekamp contends that he also submitted certain "post-hearing" exhibits on October 16, 1998, to the Social Security Administration Office of Hearings and Appeals in Sioux Falls, South Dakota, "which somehow never made it into this Transcript." *See* Plaintiff's Brief at 33. Those exhibits, consisting of evaluations by psychiatrist Dr. Paul D. Anderson, who treated Wiekamp in 1985–86, and again beginning in 1997, are attached to Wiekamp's brief in these proceedings as Exhibit A. The records from Dr. Anderson consist of a Disability Psychiatric Evaluation dated September 8, 1998; a Psychiatric Review Technique dated September 12, 1998; and a Mental Residual Functional Capacity Assessment dated September 12, 1998. These evaluations, which all date from several months after the ALJ's decision on May 12, 1998, do not "relat[e] to the period before the date of the ALJ's decision." *See Cunningham*, 222 F.3d at 500; *see also* 20 C.F.R. § 404.970(b). Therefore, the court will not consider the September 1998 evaluations by Dr. Anderson in its consideration of whether the record as a whole supports the ALJ's determination, although the court will consider the additional evidence made part of the record by the Appeals Council. *Id.*

## B. Disregard Of Opinions Of Treating Physicians

Wiekamp's first contention in this action for judicial review and reversal of the ALJ's decision is that the ALJ improperly rejected the opinions of Wiekamp's primary treating physicians. The court finds that this contention is central to disposition of this action for judicial review.

### 1. Contentions of the parties

Wiekamp argues that the ALJ not only rejected the conclusions of the Social Security Administration's consulting physicians, but the conclusions of Wiekamp's treating psychiatrist, Dr. Bandettini, and his treating physician, Dr. Elkjer. Instead, Wiekamp contends that the ALJ "generally substituted his own slanted view of the record in order to arrive at his predetermined goal of denying disability." Plaintiff's Brief at 20. Wiekamp contends that the ALJ immediately set about rejecting Dr. Bandettini's conclusions by attempting to exclude from the record Exhibit 17F, because it was not signed, although the exhibit was clearly associated with Dr. Bandettini's other records. Wiekamp contends that the ALJ's decision does not reflect that the ALJ ever considered this exhibit when a signed copy was later submitted and made part of the record. *See* Exhibit 17F, Transcript at 305–317. Wiekamp argues that, even in the absence of this evidence, the record includes extensive office notes and signed reports that consistently state Dr. Bandettini's conclusion that Wiekamp was disabled by post-polio syndrome and depression in early 1996 and that his condition would only worsen in the long term, even if it varied from day to day. Thus, Wiekamp contends that the ALJ's conclusion that Dr. Bandettini's conclusions are based on minimal clinical findings is clearly contrary to the record evidence, including detailed reports of Wiekamp's physical and mental condition by Dr. Bandettini and other physicians. He contends further that the ALJ erred in rejecting this evidence from a

treating physician. Wiekamp contends that even the doctor chosen by the ALJ observed some physical impairments, whereas the conclusions of a physical therapist, on which the ALJ relied, cannot constitute "substantial evidence" to support the ALJ's decision. Wiekamp also points out that his family physician, Dr. Elkjer, also clearly concluded, based on adequate medical records, that Wiekamp is suffering from post-polio syndrome and depression.

The Commissioner argues, in essence, that there is sufficient contrary medical evidence in the record to support the ALJ's rejection of the conclusions of Dr. Bandettini and Dr. Elkjer. The Commissioner points to an August 1996 evaluation by a physical therapist indicating that Wiekamp's strength in all muscle groups was 5/5; Dr. Bandettini's September 1996 finding that Wiekamp's memory was intact and his intelligence was normal; Dr. McGrath's November 1997 findings, after a neuropsychological evaluation, that Wiekamp's deficits were not consistent with post-polio syndrome, that Wiekamp was overestimating his cognitive impairments, and that Wiekamp was more sensitive to any cognitive deficits than was objectively warranted; and a MRI in February 1998 that indicated that Wiekamp's brain was essentially normal.

### 2. Weight of treating physicians' opinions

The importance of the opinions of treating physicians in the determination of disability is well-settled:

A treating physician's opinion should not ordinarily be disregarded and is entitled to *substantial weight*. *See Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir. 1991). A treating physician's opinion regarding an applicant's impairment will be granted *controlling weight*, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998). By

contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Id.* Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *See Nevland [v. Apfel]*, 204 F.3d [853,] 858 [ (8th Cir.2000) ].

\*\*\*

... [Where] [t]here is no evidence in the record to support the ALJ's residual functional capacity finding other than the non-treating physicians' assessments ... [t]hese assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician. *See Henderson v. Sullivan*, 930 F.2d 19, 21 (8th Cir.1991).

\*\*\*

The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. *See Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R § 404.1527(d)(2).

*Singh*, 222 F.3d at 452 (emphasis added); *Cunningham*, 222 F.3d at 502; *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000); *Jenkins v. Apfel*, 196 F.3d 922, 924–25 (8th Cir.1999).

Although it is well-established that a treating physician's opinion is entitled to at least substantial weight, and sometimes controlling weight, the Eighth Circuit Court of Appeals has "also cautioned that [a treating physician's] opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Prosch*, 201 F.3d at 1013 (quoting *Bentley v. Shalala*, 52 F.3d 784, 785–86 (8th Cir.

1995)). Thus, the Eighth Circuit Court of Appeals has "upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' *Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir.1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, *see Cruze v. Chater,* 85 F.3d 1320, 1324–25 (8th Cir. 1996)." *Prosch,* 201 F.3d at 1013 (finding the treating physician's opinion was properly disregarded on these grounds). Similarly, the ALJ may properly reject the conclusions of a treating physician that are based on the claimant's own descriptions of his or her pain or impairments, where the claimant's subjective complaints are properly discredited. *See Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000).

In *Singh v. Apfel,* 222 F.3d 448 (8th Cir.2000), where the court found that "[t]he record here is replete with evidence that substantiates the opinion of Singh's treating physician," the only contrary evidence was the opinions of non-treating physicians, and the treating physician was a specialist, the court held that the ALJ had improperly disregarded the conclusions of the claimant's treating physician. *Singh,* 222 F.3d at 452. Similarly, in *Cunningham v. Apfel,* 222 F.3d 496 (8th Cir. 2000), the Eighth Circuit Court of Appeals concluded that, if the ALJ had properly credited the opinions of treating physicians, the evidence would have supported a conclusion that the claimant was presumptively disabled, either by diabetes, neuropathy, or mental illness, or that the claimant, at the very least, had combined impairments that mandated a finding that the claimant could not return to her former job. *Cunningham,* 222 F.3d at 502.

### 3. Was the treating psychiatrist's opinion properly disregarded?

#### a. General misapprehension of the record

In the present case, the ALJ disregarded Dr. Bandettini's conclusions that Wiek-

amp was suffering from disabling post-polio syndrome and depression, stating his reasons for disregarding Dr. Bandettini's conclusions at several points in his decision. The ALJ's general conclusion about Dr. Bandettini's evidence was stated as follows:

> The undersigned is at a loss to understand how Dr. Bandettini has concluded that the claimant meets a listed impairment and is as functionally restricted as claimed, when the medical record is devoid of more than minimal findings and when much of Dr. Bandettini's report is based on mere speculation of possible future complications.

ALJ's Decision at 9 (Transcript at 22). However, the court finds itself at a loss to understand how the ALJ could have reached this conclusion, unless he ignored Dr. Bandettini's clinical findings and the findings and test results of other physicians upon which Dr. Bandettini in part relied. *See* Exhibit 3F at 2 (Transcript at 201) (Dr. Bandettini's notes indicating symptoms of depression and anxiety, fear, sleep and breathing problems, long-cycling bipolar depressive moods and their effect on his work); Exhibit 4F at 2 (Transcript at 207) (Dr. McMillin's report indicating likely thyroid problems); Exhibit 6F at 1–2 (Transcript at 209–10) (Dr. Bandettini's report to a disability insurance carrier detailing Wiekamp's symptoms and their relationship to post-polio syndrome); Exhibit 11F at 1 (Transcript at 266) (Dr. Bandettini's notes on visit 9/10/96 evaluating the presence or absence of symptoms of affect and mood disorders, thought content difficulties, mental grasp and cognitive capabilities, judgment and insight, with a summary and diagnostic impressions), 3 (Transcript at 268) (same for 10/22/96, reiterating conclusion Wiekamp suffers from post-polio syndrome, although he is doing better), 6 (Transcript at 271) (same from 3/25/97 indicating that Wiekamp "is doing a little bit better, but I am concerned that he sometimes minimizes the way that he feels, and he is very tired," and planning a referral for a

neuropsychological examination), 7 (Transcript at 272) (same from 4/15/97, noting that Wiekamp "sometimes minimizes his tiredness," treatment of hypothyroidism, which is identified as a symptom of postpolio syndrome, and a literature review), 8 (Transcript at 273) (same from 4/29/97, noting "very subtle changes" neurologically "that have taken place that are difficult to be measured grossly," plus evidence for "exhaustion at times," noting thyroid test results, and Dr. Gregg's impressions of lethargy and tinnitus); Exhibit 14F at 1 (Transcript at 286) (Dr. Elkjer's notes from visit on 4/4/97 indicating "[s]ome days [Wiekamp] feels quite well, other days, he is so weak he cannot even get around"); Exhibit 15F at 1 (Transcript at 287) (laboratory report from 9/27/96 of thyroid tests by Dr. McMillin); Exhibit 22F (Transcript at 340) (TOVA test results indicating certain mental functioning impairments), 3 (Transcript at 350) (Dr. Bandettini's chart note for 9/3/97 stating his conclusion that TOVA results are consistent with post-polio syndrome). Although the court will consider the adequacy of Dr. Bandettini's clinical findings to support his specific diagnoses below, the ALJ's general rejection of Dr. Bandettini's opinions requires more discussion.

The court agrees with the ALJ to the extent that Dr. Bandettini's most extensive report, signed on October 30, 1997, but dated September 29, 1997, Exhibit 16F (Transcript at 291–304), does, on a number of occasions, indicate the likely progression of Wiekamp's impairments in light of Dr. Bandettini's review of psychiatric and medical literature regarding post-polio syndrome. However, the court cannot agree with the ALJ that such "speculation" about future impairments is offered instead of evaluations of Wiekamp's actual condition at the time. Rather, in the first several pages of the "Attachment" to that report, Dr. Bandettini details Wiekamp's current physical and mental condition, occasionally interspersed with citations to pertinent literature confirming that such symptoms are consistent with post-polio syndrome. See id. at 5–8 (Transcript at 295–98; internal pagination at 1–4). Dr. Bandettini takes a similar approach in his discussion of Wiekamp's "Vocational Status," see id. at 8–10 (Transcript at 298–300; internal pagination at 4–6), and "Functional Capacity Assessment." See id. at 10–14 (Transcript at 300–304; internal pagination at 6–10).

Substantial discussion of the likelihood of future complications or prognosis for a syndrome for which Dr. Bandettini noted "there is not an agreed understanding," see Exhibit 16F at 5 (Transcript at 295; internal pagination at 1), certainly does not undermine Dr. Bandettini's conclusions that Wiekamp was already disabled, at least if those conclusions about Wiekamp's present condition are based on sufficient clinical findings and medical evidence. See Singh, 222 F.3d at 452 ("A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.") (citing Kelley, 133 F.3d at 589) (emphasis added). It is also apparent that this report was not prepared for a determination of disability under the Social Security Act, in the first instance, but was instead prepared for a disability insurance carrier, which may account for the extensive discussion of pertinent medical literature and a greater emphasis on prognosis than is ordinarily the case in Social Security disability evaluations. However, even for Social Security purposes, " '[d]isability' is defined as an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.' " Gartman v. Apfel, 220 F.3d 918, 921 (8th Cir.2000) (quoting 42 U.S.C. § 423(d)(1)(A)). Thus, Dr. Bandettini's conclusions that Wiekamp's condition will, in all likelihood, only worsen, is certainly

pertinent to a disability determination even in the present context.

Moreover, turning to specifics, the court finds that the ALJ has grossly misrepresented Dr. Bandettini's report in an effort to discredit its conclusions on the ground that they are based on "speculations." Just before his scathing conclusion, quoted above, the ALJ wrote,

By September 1997, Dr. Bandettini attributed the claimant with major depression secondary to medical problems, rule out dementia and a delusional disorder not otherwise specified. (Exhibit 16F at p. 5.) [Transcript at 295.] This report is discussed in detail above and this will not be repeated here. That discussion is incorporated by reference. The undersigned will however simply note that the ten page report of Dr. Bandettini discusses a number of problems related to post-polio syndrome for which there is no evidence the claimant suffers. *For example, Dr. Bandettini discusses problems of swallowing for more than one-half page. (Id. at p. 9.) [Transcript at 299.] Nowhere in the clinical notes is there any mention that the claimant has had difficulties with swallowing. Further, in his report, Dr. Bandettini himself notes that the claimant appeared to be functioning adequately on neuropsychological testing and, yet, apparently disregards these objective findings. (Id.)*

ALJ's Decision at 8–9 (Transcript at 21–22) (emphasis added). These characterizations are untenable. Dr. Bandettini's discussion of "swallowing" comprises only eight lines in a page of single-spaced text, not "more than one-half page," as the ALJ asserts, and, although this brief discussion of swallowing difficulties in individuals suffering from post-polio syndrome does not suggest that Wiekamp currently suffers from such difficulties, it is proper discussion of Wiekamp's prognosis in likely working conditions. *See* Exhibit 16F at 9 (Transcript at 299; internal pagination at 5).[1] Again, substantial discussion of the likelihood of future complications or prognosis for a syndrome for which Dr. Bandettini noted "there is not an agreed understanding," *id.* at 5 (Transcript at 295; internal pagination at 1), certainly does not undermine Dr. Bandettini's conclusions that Wiekamp was already disabled, at least if those conclusions about Wiekamp's present condition are based on sufficient clinical findings and medical evidence. *See Singh,* 222 F.3d at 452. Furthermore, Dr. Bandettini did not simply "disregard" "objective" neuropsychological test results, as the ALJ suggests. Rather, Dr. Bandettini pointed out where his own clinical observations contradicted suggestions from the neuropsychological testing that Wiekamp "appeared to be functioning adequately," pointed out where his own observations were consistent with the results of Dr. McGrath's neuropsychological testing, and compared the neuropsychological test results to the results of the Test of Variables of Attention (TOVA)[2] and weighed the

1. Dr. Bandettini's discussion of "swallowing," in its entirety, consists of the following:

 Even swallowing is greatly affected as noted by Dr. Frank C. Snope. It was noted that swallowing difficulties occur in 10 to 20 percent of individuals experiencing post-polio syndrome. It is noted that swallowing is a very complex mechanism involving many muscles and nerves around the throat. Polio can weaken these muscles with the result that swallowing problems can arise. The kind of swallowing problems that can occur in post-polio syndrome are coughing and choking, a feeling of sticking in the throat.

 Even with a desk job that Mr. Wiekamp could have, he could have swallowing problems that could occur which are very significant and severe.

 Exhibit 16F at 9 (Transcript at 299; internal pagination at 5).

2. This comparison of the results of the TOVA to the results of the neuropsychological testing was invited by the psychologist who evaluated the results of the latter test, Dr. McGrath, himself. *See* Exhibit 26F at 9 (Transcript at 369; internal pagination at 8). Dr. McGrath noted that, although the TOVA "is not a commonly employed neuropsychological measure," it "does require more sustained attention to task than the [neuropsychological test]." *Id.*

results. Exhibit 16F at 9–10 (Transcript at 299–300; internal pagination at 5–6); *see also* Exhibit 22F (TOVA) (Transcript at 340–47). Such an evaluation of varying test results falls uniquely within the purview of a specialist, such as Dr. Bandettini. *Singh,* 222 F.3d at 452 ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") (citing *Metz,* 49 F.3d at 377); *but see Prosch,* 201 F.3d at 1013 (the Eighth Circuit Court of Appeals has "upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.") (internal citations and quotation marks omitted).

The court's "scrutinizing" review of what is actually said in Dr. Bandettini's report, versus the ALJ's characterization, severely detracts from the ALJ's general characterization of the report. *See Singh,* 222 F.3d at 451 ("In determining whether existing evidence is substantial, we consider 'evidence that detracts from the Commissioner's decision as well as evidence that supports it.'") (quoting *Warburton,* 188 F.3d at 1050); *accord Wheeler,* 224 F.3d at 893–94; *Burnside,* 223 F.3d at 843; *Rankin,* 195 F.3d at 428; *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998); *Wilcutts,* 143 F.3d at 1136–37.

Not only is the ALJ's general characterization of Dr. Bandettini's opinions as based on speculation about future complications not entirely accurate, the ALJ's criticism of what he took to be each of Dr. Bandettini's determinations that Wiekamp suffers from a "listed" impairment is also untenable. Each such criticism will be taken in turn.

#### b. The 12.02 diagnosis

First, the ALJ rejected Dr. Bandettini's diagnosis of Wiekamp as suffering from an organic mental disorder that meets Social Security disability "listing" 12.02:

> Dr. Bandettini diagnosed the claimant with an organic mental disorder, which is evaluated under listing 12.02. . . .
>
> Despite Dr. Bandettini's opinion that the claimant meets listing 12.02, the medical record does not support a finding that the claimant suffers from any specific organic factor to which the claimant's symptoms can be attributed. The claimant underwent a brain MRI in February 1998, the results of which were considered to be without significant pathology (Exhibit 27F at p. 2) [Transcript at 382.] Thus, the undersigned concludes that the claimant does not have a severe organic mental disorder as described in listing 12.02 and does not meet the criteria of listing 12.02. Furthermore, the results of the claimant's neuropsychological examination led Dr. McGrath to the conclusion that any deficit displayed by the claimant was developmental rather than being secondary to post-polio syndrome. (Exhibit 26F at p. 7) [Transcript at 367.]

ALJ's Decision at 3 (Transcript at 16).

Although the ALJ rejected Dr. Bandettini's conclusion that Wiekamp met this "listing" on the basis of the MRI results, such a conclusion is improper, in light of the comments of the psychologist who suggested such a test, Dr. McGrath:

> As a means of further evaluation of the possible post-polio syndrome, [Wiekamp] might undergo an [sic] MRI. There is evidence that at least some post-polio syndrome patients with more severe fatigue reveal small sub-cortical discrete lesions. *However, note that the absence of such lesions would not rule out the post-polio syndrome. Hence, a MRI might help confirm the diagnosis, but would not rule out that diagnosis.*

Exhibit 26F at 12 (Transcript at 372; internal pagination at 11) (emphasis added). Thus, "contrary" MRI results cannot stand as "substantial evidence" permitting either the ALJ or the court to disregard Dr.

Bandettini's diagnosis, because the MRI results are not "better" evidence, only evidence of negative results that are not diagnostic. *See Prosch,* 201 F.3d at 1013 (permitting the ALJ to disregard the treating physician's opinion if there is "better" evidence). The "organic" aspects of Wiekamp's mental disorder are, of course, his post-polio syndrome and hypothyroidism.

Similarly, although the ALJ attributes to Dr. McGrath a conclusion, based on the neuropsychological testing, that any deficit displayed by the claimant was developmental rather than being secondary to post-polio syndrome, Dr. McGrath reached no such broad conclusion. Rather, at the cited portion of his report, Dr. McGrath states only that any deficit Wiekamp was displaying in *intellect* may be largely developmental in nature, as opposed to being secondary to post-polio syndrome. *See* Exhibit 26F at 7 (Transcript at 367). Dr. McGrath's own "Diagnostic Impression," based on medical records, was that Wiekamp suffered from post-polio syndrome. *Id.* at 11 (Transcript at 371). Although the court recognizes that Dr. McGrath's evaluation is, in general, far less pessimistic about Wiekamp's impairments than is Dr. Bandettini's evaluation, it should be noted that Dr. McGrath apparently based his evaluation on results from a single test or battery of tests on a single occasion, whereas Dr. Bandettini had long and intense clinical contact with Wiekamp, encompassing the use of a variety of diagnostic tools. *Cf. Singh,* 222 F.3d at 452 (the opinion of a treating physician should be given more weight than that of a consulting physician who examines the claimant once or not at all).

■ The court cannot find that the ALJ properly disregarded Dr. Bandettini's conclusions regarding "listed" impairment 12.02, because there are no "other medical assessments [that] are supported by better or more thorough medical evidence," and Dr. Bandettini did not "rende[r] inconsistent opinions that undermine the credibility of such opinions." *Prosch,* 201 F.3d at 1013 (internal citations and quotation marks omitted). Under the circum-

stances, Dr. Bandettini's opinion concerning this impairment is entitled to at least "substantial," and more likely "controlling," weight, *see Singh,* 222 F.3d at 452, while a "scrutinizing" analysis demonstrates that the ALJ's misreading of the record evidence severely detracts from his conclusions that the listing had not been met. *Id.* at 451 ("In determining whether existing evidence is substantial, we consider 'evidence that detracts from the Commissioner's decision as well as evidence that supports it.'") (quoting *Warburton,* 188 F.3d at 1050); *accord Wheeler,* 224 F.3d at 893–94; *Burnside,* 223 F.3d at 843; *Rankin,* 195 F.3d at 428; *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998); *Wilcutts,* 143 F.3d at 1136–37.

### c. The 12.06 diagnosis

Next, the ALJ rejected what he took to be Dr. Bandettini's opinion that Wiekamp meets "listing" 12.06:

The medical record reveals that Dr. Bandettini has also diagnosed the claimant as suffering from an anxiety disorder, "fear of slowly losing his mind and all strength in his body." (Exhibit 17F at p. 5.) [Transcript at 309.] Here, Dr. Bandettini opines that the claimant satisfies not only listing 12.06A, but listing 12.06B. However, the undersigned finds that the medical record, when viewed in its entirety, does not support a finding that the claimant suffers from a severe anxiety disorder let alone one resulting in at least two of the following: marked restriction in daily living activities; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; or repeated episodes of deterioration or decompensation in work or work-like settings. Nor does the claimant suffer from the complete inability to function independently outside the area of the claimant's home, satisfying 12.06C.

Dr. Bandettini's clinical notes contain no diagnosis of an anxiety related disorder. (See Exhibits 3F, 6F, 13F, 23F and

25F.) It is only in his report of September 1997, to the claimant's long term disability carrier, that Dr. Bandettini makes this diagnosis. The undersigned does not accept this diagnosis, bereft of clinical findings and support in the records of treatment, to be a severe impairment.

ALJ's Decision at 4 (Transcript at 17).

The critical flaw in the ALJ's reading of Dr. Bandettini's "diagnosis" of a 12.06 "listed" impairment is that Dr. Bandettini never made such a diagnosis in his report in Exhibit 17F. At page one of Exhibit 17F, Dr. Bandettini did indicate that his conclusion that Wiekamp meets a "listed" mental impairment was based on categories 12.02, 12.04, and 12.06, but, at page 5 of the report, to which the ALJ cites, there is no "diagnosis" of such a "listed" impairment. Rather, Dr. Bandettini indicated under his evaluation of 12.06 anxiety related disorders that there was "insufficient evidence" of "[g]eneralized persistent anxiety accompanied by ... [v]igilance and scanning," and that there was "insufficient evidence" of "Other" impairments, which Dr. Bandettini identified as "[f]ear of slowly losing his mind and all strength in his body." Thus, there is no "inconsistency" between the lack of clinical evidence in the record and a diagnosis of a 12.06 "listed" impairment where Dr. Bandettini never diagnosed such an impairment. *See Prosch*, 201 F.3d at 1013.

Again, the ALJ's mischaracterization of Dr. Bandettini's evaluation of 12.06 symptoms severely detracts from his rejection of Dr. Bandettini's opinions regarding impairments the doctor *did* diagnose. *See Singh*, 222 F.3d at 451; *accord Wheeler*, 224 F.3d at 893–94; *Burnside*, 223 F.3d at 843; *Rankin*, 195 F.3d at 428; *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir. 1998); *Wilcutts*, 143 F.3d at 1136–37.

### d. The 12.04 diagnosis

Finally, the ALJ rejected Dr. Bandettini's conclusions that Wiekamp meets "listing" 12.04. It is on this diagnosis, however, that Wiekamp "hangs his hat" for a determination that he suffers from a "listed" impairment.

Under "listing" 12.04, that is, 20 C.F.R. at Pt. 404, Subpt. P, App. 1, § 12.04, "[a] presumptively disabling affective disorder is shown by a medically documented depressive syndrome accompanied by functional loss severe enough to be incompatible with the ability to perform work-related functions." *Cunningham*, 222 F.3d at 502 n. 8; *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir.1998). Similarly, "[t]o meet *or equal* a depressive syndrome, the claimant must have at least four of the nine listed symptoms and the impairment must result in at least two of the four listed functional limitations of an affective disorder." *Pyland*, 149 F.3d at 877 (emphasis added).[3]

The ALJ's ground for rejecting Dr. Bandettini's diagnosis of this "listed" disability is as follows:

The claimant suffers from depression and satisfies the listings at 12.04A. However, the medical record does not support a finding that the claimant's depression has been severe enough for a twelve month period of time to meet the criteria of 12.04B, requiring at least two of the functional restrictions set forth above for 12.02B, even though Dr. Bandettini is of a different opinion.

In Dr. Bandettini's evaluation of the claimant referred to above, he diagnosed the claimant with major depression secondary to medical problems, rule out dementia, and a delusional disorder not otherwise specified. (Exhibit 16F at p. 5.) [Transcript at 295.] At the time of this report in September 1997, Dr. Bandettini relates that the claimant presented with no loosening of thoughts or

---

**3.** Because a claimant must meet both prongs of "listing" 12.04, it is not enough, as Wiekamp appears to assert, in his fourth objection to the ALJ's Decision, that Wiekamp satisfy "listing" 12.04A for him to be disabled.

ideas, hallucinations and with intact judgment but with mildly paranoid thoughts and fair to poor concentration and attention span. (*Id.* at p. 6.) [Transcript at 296.] It is noted that the claimant is irritable and feels fatigued. (*Id.* at p. 12.) [Transcript at 302 .] Although noting these minimal findings, Dr. Bandettini opines that the claimant suffers from moderate to marked daily living restrictions, marked difficulties in social functioning, frequent deficiencies of concentration, persistence or pace and repeated episodes of deterioration or decompensation in work or work-like settings. (Exhibit 17F at p. 8.) [Transcript at 312.] This would satisfy the requirements of listing 12.04B.

However, the undersigned declines to accept this opinion as dispositive. As already mentioned, Dr. Bandettini's conclusions are based on minimal clinical findings. Additionally, Dr. Bandettini specifically notes that the claimant suffers from symptoms, which the claimant himself denied or for which there is no report in the file. For example, Dr. Bandettini has checked that the claimant suffers from hallucinations, delusions, or paranoid thinking. (Exhibit 17F at p. 4.) [Transcript at 308.] However, in the body of his report Dr. Bandettini reports that the claimant denies hallucinations, there is no mention of delusions and the only concrete mention of paranoia is to note a report of mildly paranoid thoughts and "past paranoia" under the category "other," without further explanation.

The undersigned does not find Dr. Bandettini's report to be attended with the requisite specificity, clinical findings and consistency to merit full credibility. The undersigned does not find that the claimant satisfies the criteria of listing 12.04.

ALJ's Decision at 5 (Transcript at 18). Thus, although the ALJ agreed with Dr. Bandettini's conclusion that Wiekamp satisfies "listing" 12.04A, regarding symptoms of a depressive syndrome, the ALJ rejected Dr. Bandettini's conclusion that Wiek-

amp also satisfies "listing" 12.04B, the requisite functional restrictions for a 12.04 "listed" disability. *See Cunningham,* 222 F.3d at 502 n. 8; *Pyland,* 149 F.3d at 877.

 The court notes that the ALJ erred, as a matter of law, by suggesting that the claimant's depression must *have been* severe enough for a twelve month period of time to meet the criteria of 12.04B. *See* ALJ's Decision at 5 (Transcript at 18). The definition of "disability" for Social Security purposes is not founded simply on impairments that have already lasted for twelve months, but also encompasses "any medically determinable physical or mental impairment which … *can be expected* to last for a continuous period of not less than 12 months." *Gartman,* 220 F.3d at 921 (quoting 42 U.S.C. § 423(d)(1)(A)). Thus, Dr. Bandettini's conclusions that Wiekamp suffers certain functional restrictions that can be expected to last for more than twelve months, and indeed, can only be expected to worsen as time goes by, if otherwise supported by the record, are sufficient to satisfy the "functional restriction" requirements of this "listing." It should also be noted that Dr. Bandettini opines that ordinary activities and stresses of work and "pushing" himself to do more are likely only to quicken Wiekamp's deterioration, because this is one of the documented and distressing facts of post-polio syndrome. *See* Exhibit 16F at 6 (Transcript at 296; internal pagination at 2); *id.* at 8–9 (Transcript at 298–99; internal pagination at 4–5).

Moreover, the ALJ's rejection of Dr. Bandettini's conclusion that Wiekamp meets the functional restrictions of "listing" 12.04B is also untenable under a "scrutinizing" examination of the record evidence. *See Singh,* 222 F.3d at 451; *accord Wheeler,* 224 F.3d at 893–94; *Burnside,* 223 F.3d at 843; *Rankin,* 195 F.3d at 428; *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998); *Wilcutts,* 143 F.3d at 1136–37. As quoted above, the ALJ mentioned that Dr. Bandettini "relates that the claimant presented with no

loosening of thoughts or ideas, hallucinations and with intact judgment but with mildly paranoid thoughts and fair to poor concentration and attention span," citing Exhibit 16F at 6 (Transcript at 296; internal pagination at 2), and "that the claimant is irritable and feels fatigued," citing Exhibit 16F at 12 (Transcript at 302; internal pagination at 8), rejecting these "minimal findings" as sufficient to sustain Dr. Bandettini's finding of functional restrictions. ALJ's Decision at 5 (Transcript at 18). To demonstrate the extent to which the ALJ has again misrepresented Dr. Bandettini's report, it is worthwhile to quote in its entirety the paragraph of Dr. Bandettini's report in which he notes the lack of symptoms to which the ALJ pointed:

[Wiekamp's] present condition findings and most recent mental status exam show the following: As far as his attitude and general behavior are concerned, he appears to be his stated age of 46. *He appears to be psychologically ill. He is distressed about his ability to do things properly. His affect and mood is described quantitatively as increased, and his thought content is decreased in quantity and quality.* He shows no evidence of any loosening of thoughts or flood of ideas. The patient denies hallucinations. *He has ringing in his ears. He feels that the public is rejecting him at times and they may well have a misunderstanding of his disorder.* He has mildly paranoid thoughts. *Patient shows evidence of intelligence of fair to normal. Below-normal abstractive abilities.* Attention span is fair to poor, concentration is fair to poor, and the patient's personal and impersonal judgment is intact.

Exhibit 16F at 6 (Transcript at 296; internal pagination at 2) (emphasis added). The italicized findings, omitted from the ALJ's Decision, paint a very different picture of the degree to which Dr. Bandettini made relevant clinical findings that support functional restrictions.

As to "irritability" and "fatigue," the record more than adequately supports Dr. Bandettini's findings of impairments that impose marked functional restrictions. The medical records and the hearing testimony are replete with references to Wiekamp suffering from debilitating fatigue. *See, e.g.,* Exhibit 11F at 6 (Transcript at 271) (Dr. Bandettini's notes from 3/25/97 indicating that Wiekamp "is doing a little bit better, but I am concerned that he sometimes minimizes the way that he feels, and he is very tired"), 7 (Transcript at 272) (same from 4/15/97, noting that Wiekamp "sometimes minimizes his tiredness"), 8 (Transcript at 273) (same from 4/29/97, noting "exhaustion at times" and Dr. Gregg's impression of "lethargy"); Exhibit 14F at 1 (Transcript at 286) (Dr. Elkjer's notes from visit on 4/4/97 indicating "[s]ome days [Wiekamp] feels quite well, other days, he is so weak he cannot even get around"). Dr. Bandettini's report also points out repeatedly that fatigue is the most characteristic, and often the most debilitating, symptom of post-polio syndrome. *See* Exhibit 16F at 6–7 (Transcript at 296–97; internal pagination at 2–3). Similarly, as to "minimal" findings of "irritability," Dr. Bandettini noted the following:

"As noted in the neuropsychological testing, [Wiekamp] appeared to be functioning adequately. However, Mr. Wiekamp has a history of jumping to conclusions based on limited information. This is typical of some of the symptoms that I spoke of such as the inability to control how he feels. As difficulties arise, he is likely to hold a grudge. He is often irritable and annoyed, most likely due to the fatigue that he is fighting. In the testing by Dr. McGrath, he has a tendency to see himself as being treated unfairly, and, indeed, there is a great distrust of others. Socially, he is fairly quick to externalize blame onto others. He has had some social relationships that have been quite difficult at times."

Exhibit 16F at 9–10 (Transcript at 299–300; internal pagination at 5–6). Thus, Dr. Bandettini's conclusions cannot be rejected on the basis of inadequate clinical

findings of fatigue and irritability. *See Singh,* 222 F.3d at 452 ("A treating physician's opinion regarding an applicant's impairment will be granted *controlling weight,* provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.") (citing *Kelley,* 133 F.3d at 589) (emphasis added).

The ALJ also relied, in part, on Dr. Bandettini's attention to symptoms that Wiekamp himself denied. *See* ALJ's Decision at 5 (Transcript at 18). As an example, the ALJ asserted that Dr. Bandettini had checked that Wiekamp suffers from hallucinations, delusions, or paranoid thinking in his evaluation in Exhibit 17F at p. 4 (Transcript at 308), but, "in the body of his report Dr. Bandettini reports that the claimant denies hallucinations, there is no mention of delusions and the only concrete mention of paranoia is to note a report of mildly paranoid thoughts and 'past paranoia' under the category 'other,' without further explanation." ALJ's Decision at 5 (Transcript at 18). However, the ALJ has misread the record by suggesting that Dr. Bandettini's "report," Exhibit 16F, prepared on September 29, 1997, and signed on October 30, 1997, is necessarily intended to elucidate his "Psychiatric Review Technique," Exhibit 17F, prepared on October 31, 1997. Rather, the "report" in Exhibit 16F elucidates the "Psychiatric Assessment" to which it is appended. Moreover, the ALJ mischaracterizes Dr. Bandettini's "Psychiatric Review Technique" in Exhibit 17F by asserting that Dr. Bandettini checked that Wiekamp suffers from hallucinations, delusions, or paranoid thinking, citing Exhibit 17F at p. 4 (Transcript at 308). At the cited portion of Exhibit 17F, Dr. Bandettini specifically circled "paranoid" in the list of *Alternatives*-including "hallucinations" and "delusions" in addition to "paranoid thinking"-in line "h." for "manic syndrome" symptoms.

Thus, Dr. Bandettini never suggested that Wiekamp suffers "hallucinations" or "delusions." Furthermore, Dr. Bandettini explained specifically what he meant by "paranoid thinking" on a number of occasions, including in the "report" in Exhibit 16F at 6 (Transcript at 296; internal pagination at 2), where he explains that Wiekamp "feels that the public is rejecting him at times and they may well have a misunderstanding of his disorder. He has mildly paranoid thoughts." *See also id.* at 9 (Transcript at 299; internal pagination at 5) (describing Wiekamp's fears of public rejection). Again, Dr. Dandettini noted that, "[i]n the testing by Dr. McGrath, [Wiekamp] has a tendency to see himself as being treated unfairly, and, indeed, there is a great distrust of others. Socially, he is fairly quick to externalize blame onto others. He has had some social relationships that have been quite difficult at times." Exhibit 16F at 9–10 (Transcript at 299–300; internal pagination at 5–6).[4]

■ Thus, the ALJ pointed to no sufficient basis for rejecting Dr. Bandettini's conclusions that Wiekamp suffers a 12.04 "listed" impairment. *See Prosch,* 201 F.3d at 1013; *Craig,* 212 F.3d at 436. Instead, "[t]he record here is replete with evidence that substantiates the opinion of [Wiekamp's] treating physician," and that treating physician, in the case of Dr. Bandettini, was a specialist. *Singh,* 222 F.3d at 452. Thus, Dr. Bandettini's conclusions should have been controlling. *Id.* Moreover, as in *Cunningham,* if the ALJ had properly credited the opinion of Dr. Bandettini, as a treating physician, the evidence would have supported a conclusion that Wiekamp was presumptively disabled, by depression and post-polio syndrome, or that Wiekamp, at the very least, had combined impairments that mandated a finding that he could not return to his former job. *See Cunningham,* 222 F.3d at 502. The ALJ himself concluded that Wiekamp

---

4. The court has already rejected as a mischaracterization the ALJ's suggestion that Dr. Dandettini relied on "speculation" about future impairments, so that the court need not address again the ALJ's comments that Dr. Bandettini relied on impairments for which there is no report in the file.

could not return to his past relevant work. *See* ALJ's Decision at 2 (Transcript at 15). Thus, if Wiekamp is not presumptively disabled-despite Dr. Dandettini's conclusion that he meets both the symptoms and functional restrictions prongs of "listing" 12.04-the question is whether Dr. Bandettini's conclusions also establish that Wiekamp cannot perform other jobs in significant numbers in the national economy. Thus, at least in the alternative, the court must consider the impact of Dr. Bandettini's conclusions on the findings of the vocational expert.[5]

### C. Vocational Expert's Testimony

 Wiekamp contends that the ALJ erred by failing to adopt the vocational expert's opinion, on one hypothetical question, that Wiekamp could not perform any jobs available in significant numbers in the national economy, instead adopting the vocational expert's contrary opinion, on another, improper hypothetical question, that Wiekamp was able to perform certain available jobs. The Eighth Circuit Court of Appeals recently explained,

"Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir.1997). Although "questions posed to vocational experts should precisely set out the claimant's particular physical and mental impairments, ... a proper hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ." *House v. Shalala*, 34 F.3d 691, 694 (8th Cir.1994) (internal citations, quotation marks, and alterations omitted).

*Roberts v. Apfel*, 222 F.3d 466, 471 (8th Cir.2000). "The hypothetical need not use

5. In other words, the court finds that Wiekamp is disabled at the *third* step in the disability determination process, but will, in the alternative, consider-in light of the ALJ's conclusion that Wiekamp cannot perform his past relevant work, which satisfies step *four*-whether Wiekamp is disabled when the burden shifts to the Commissioner at the *fifth* step of the analysis to show that, notwithstanding his functional limitations, the claimant has the residual functional capacity to perform jobs in significant numbers in the national economy. In keeping with administrative regulations 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920, the Eighth Circuit Court of Appeals has repeatedly summarized the five-step disability evaluation process as follows:

[The Commissioner] determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment-one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and workexperience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commission-

er to prove that there are other jobs in the national economy that the claimant can perform. *See Kelley v. Callahan*, 133 F.3d 583, 587–88 (8th Cir.1998).

*Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998); *accord Bladow v. Apfel*, 205 F.3d 356, 359 n. 5 (8th Cir.2000) (similar summary); *Kerns v. Apfel*, 160 F.3d 464, 466 n. 6 (8th Cir.1998) (same summary, citing *Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir .1998), and 20 C.F.R. § 404.1520); *Baker v. Apfel*, 159 F.3d 1140, 1143–44 (8th Cir.1998) (same summary, citing *Kelley*); *Fenton v.. Apfel*, 149 F.3d 907, 910 (8th Cir.1998); *Kelley v. Callahan*, 133 F.3d 583, 587–88 (8th Cir.1998); *see also Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir.1999) (referring to the five-step process established by 20 C.F.R. § 1404.1520(a)–(f), but not identifying specifically the steps in the process); *and compare Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.1998) (stating the burden-shifting process in two succinct steps: "To establish a disability claim, the claimant bears the initial burden to show that she is unable to perform her past relevant work.... If met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of jobs in the national economy that are consistent with the claimant's impairments and with vocational factors such as age, education, and work experience.") (citations omitted).

specific diagnostic terms ... where other descriptive terms adequately describe the claimant's impairments." *Warburton,* 188 F.3d at 1050. An ALJ is not required to include in a hypothetical question to a vocational expert any impairments that are not supported by the record. *Prosch,* 201 F.3d at 1015. However, where an ALJ improperly rejects the opinion of a treating physician or subjective complaints of pain by the claimant, the vocational expert's testimony that jobs exist for the claimant does not constitute substantial evidence on the record as a whole where the vocational expert's testimony does not reflect the improperly rejected evidence. *See Singh,* 222 F.3d at 453 ("In view of our findings that the ALJ improperly rejected both the opinion of Singh's treating physician and Singh's subjective complaints of pain, we find that the hypothetical question posed to the vocational expert did not adequately reflect Singh's impairments. Accordingly, the testimony of the vocational expert that jobs exist for Singh cannot constitute substantial evidence on the record as a whole.").

In this case, the vocational expert responded to two hypothetical questions, with different conclusions, one finding no available jobs for a person with one set of impairments, and one finding jobs available for a person with a slightly different set of impairments. Thus, the question here is whether the vocational expert's opinion on the second hypothetical question constitutes "substantial evidence" to sustain the ALJ's denial of Wiekamp's application for disability benefits.

### 1. The first hypothetical question

The first hypothetical question posed by the ALJ posited a man of Mr. Wiekamp's age, educational background, and work history. Hearing Transcript at 58 (Transcript at 93). The first hypothetical question continued as follows:

[L]et us assume that he also has a history of experiencing polio or the effects of polio when he was young and was hospitalized for a while for that, that he's been diagnosed as having a major de-

pression with possible psychosis. He has a history of dysthymia, that Dr.— the doctor who's been treating him, the psychiatrist, has attempted to rule out adjustment disorder and some early dementia according to Exhibit number 11F. Let us assume that this person has a history of having been depressed and some difficulty of a similar nature in the past, at least two times I believe, that at the present time he has a low energy level, that he is experiencing some difficulty as a result of the—excuse me a minute—he's having some difficulty with his arms and hands particularly as a result of overuse. He sometimes loses control with the left hand [but is] dominant right-handed I understand. Let us assume that he also has some difficulty with short-term memory, that he also experiences some, he also experiences some [sic] problems when it's extremely cold or hot and humid, causes him difficulty breathing. He's also taking a thyroid medication. He's being treated for thyroid problems. He's also having some ringing in our [sic] ears.

\*\*\*

And that's been a problem for him. Let us assume that he's limited to walking a mile. He walks a mile every day, stands 15 minutes and then needs to move around. Sit 30 minutes is about the maximum amount, starts to get stiff, and that his lifting is somewhat reduced by the fact that he could probably lift 50 pounds, but that would be only one time over a period of time. So probably his lifting occasionally would be reduced to probably 20 pounds occasionally, probably five to ten pounds more frequently, that he would have to be—if we talk about employment, he would have to be in an employment situation which would have a low stress factor to it, doesn't seem that it's a problem for him dealing with people or being around people, but there should—would probably at this time not be wise to have him placed in a situation where there would be pressure for—extreme pressure for production or

stress—of dealing with stressful situations.

Hearing Transcript at 58–60 (Transcript at 93–95).

In response to this hypothetical question, the vocational expert concluded that a person with such impairments could not return to Wiekamp's past relevant work. *Id.* at 60 (Transcript at 95). In response to the question of whether there are any jobs that exist in this region that such a person could perform, the vocational expert provided the following response:

> Well, what I would want to do with a guy like this with the short term memory problems is put him in some routine, repetitive kind of work, and unfortunately though if you have problems with your hands and with overuse syndrome and things like that, there's lots of assembly times [sic] that are routine, repetitive, but I don't think he's going to be able to do that based on the hand problem. And with the memory problems and things like that, there's cashier positions and things like that, but I don't think he can afford to forget where money is or forget how much money you've given or things like that. So I'm really hard-pressed to come up with anything based on the hypothetical.

Hearing Transcript at 60–61 (Transcript at 95–96). Thus, in response to the first hypothetical question, the only evidence in the record is that, if Wiekamp suffered from the specified impairments, there are no jobs available in significant numbers in the national economy that he could perform.

### 2. The second hypothetical question

The ALJ then posed a second, modified hypothetical question, as follows:

> Now, let's take a person the same age as the claimant here and with the same educational background, same work history, and the same diagnosis that he has experienced polio in the past and is suffering from *some effects of the acute polio melitis [sic]*. He also had depression called bipolar depression, also the thyroid problems, the ringing in the head. Let us assume that he would be capable of doing a full range of light or sedentary work which would require that he be able to alternately sit-stand, *but that as far as the memory is concerned that he would be able to do a job where he would not be required to have a lot of memory to deal with, and that he would not be required to do a lot of repetitive work, but he could do simple tasks of a semiskilled nature.* I'm not talking about routine unskilled-type work.

Hearing Transcript at 61 (Transcript at 96) (emphasis added). The vocational expert concluded in response to this modified hypothetical question that the claimant would have transferable skills. *Id.* He also concluded that jobs existed that would fit these restrictions:

> [T]here's some more semiskilled work that would fit. There's a lot of what we call counter clerk work where I think you can alternate sitting and standing, and based on the employers I've contacted, you can do this. Some of the jobs like I've noticed in Sioux Falls would be at the photofinishing places. They have counter clerks that sit part of the time and develop photos, and the other part of the time they're working the counter working with customers, taking orders, making change and running cash registers. And then some of the counter clerks that work at car rental agencies sit part of the time. The other time they may be at the counter filling out sales contracts or things like that. Between those two occupations, and if we look at the regional economy of say North and South Dakota, Minnesota, Iowa, we probably have no fewer than 2,000 positions. There's a lot of desk clerk positions in motels where people can alternate sitting and standing and where he can use some of his customer service skills, again operate cash register, take reservations, do some phone work, things like that. And again in the same regional economy, I would say we'd have no fewer than probably three to 4,000 positions. And then I talked

about a little earlier, but there's a lot of cashier II-type positions. Now this is more of an unskilled position, but there's a lot of these positions around. I see these kind of cashiers in car washes. Oh, some restaurants will have a cashier that simply takes change and makes change and cashes checks, things like that. Some casinos will have cashiers like that, but again in the same regionable [sic] economy, I'd say we have no fewer than 1,000 positions.

Hearing Transcript at 62–63 (Transcript at 97–98). Thus, if this second hypothetical question properly reflects Wiekamp's impairments, the vocational expert's opinion is "substantial evidence" that the Commissioner has carried his fifth-stage burden, and denial of Wiekamp's application for disability benefits was proper. *See Roberts,* 222 F.3d at 471.

### 3. Which hypothetical question properly reflects Wiekamp's impairments?

■ The court notes that, as the italicized portion of the statement of the second hypothetical question indicates, the "memory" portion of the hypothetical question was substantially changed, so that memory problems were acknowledged as eliminating positions with "a lot of memory to deal with," but permitting positions that involve doing "simple tasks of a semiskilled nature." Hearing Transcript at 61 (Transcript at 96).[6] Apparently, the vocational expert found this difference dispositive, because all of the available positions he found fit a claimant with the restrictions specified in the second hypothetical question involve precisely the money-handling tasks excluded by memory problems specified in the first hypothetical question. *Compare* Hearing

Transcript at 61 (Transcript at 96), *with id.* at 62–63 (Transcript at 97–98). Dr. Bandettini's opinion, which the court concluded above the ALJ had improperly rejected, requires that memory restrictions be included in any hypothetical question to reflect properly Wiekamp's restrictions. *See, e.g.,* Exhibit 16F at 10 (Transcript at 300; internal pagination at 6) (noting that the Social Security evaluations show a limited ability to sustain concentration, and also noting that the TOVA results indicated a cognitive decline, including a fall in attention with increasing fatigue during sustained tasks). Thus, the vocational expert's opinion based on the second hypothetical question, which is flawed by failure to include restrictions identified in Dr. Bandettini's improperly rejected opinions, does not constitute "substantial evidence" to sustain the ALJ's decision to deny Wiekamp disability benefits. *See Singh,* 222 F.3d at 453.

■ On the other hand, the vocational expert's response that no jobs were available in response to the first hypothetical question, which constitutes "a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies," *does* constitute "substantial evidence" that Wiekamp is disabled. *Roberts,* 222 F.3d at 471. This evidence detracts so substantially from the ALJ's contrary conclusion that the ALJ's denial of benefits cannot be sustained. *See Singh,* 222 F.3d at 451; *accord Wheeler,* 224 F.3d at 893–94; *Burnside,* 223 F.3d at 843; *Rankin,* 195 F.3d at 428; *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir. 1998); *Wilcutts,* 143 F.3d at 1136–37. Moreover, the absence of any substantial conflicting evidence can lead to only one conclusion: Wiekamp is disabled within

---

**6.** Wiekamp also contends that it is significant that, although the first hypothetical question specified "a low energy level," *see* Hearing Transcript at 58–60 (Transcript at 93–95), the second one does not specify fatigue or energy problems at all, referring instead, vaguely, to "some effects of the acute polio melitis [sic]." Because the court does not find that the vocational expert relied on fatigue or energy level at all in his response to either hypothetical question—even though fatigue is a common, often debilitating symptom of post-polio syndrome, and one the record reflects that Wiekamp suffers—the court will concentrate on the difference between the hypothetical questions that the vocational expert apparently found dispositive, the treatment of memory problems.

the meaning of the Social Security Act and his applications for disability benefits must be granted.

### III. CONCLUSION

The ALJ improperly rejected Wiekamp's treating psychiatrist's oft-repeated opinion, supported by adequate clinical findings, that Wiekamp is disabled by depression and post-polio syndrome for purposes of the Social Security Act. Thus, based on the testimony of the treating psychiatrist and the record as a whole, Wiekamp suffers from "listed" disability 12.04. In the alternative, the improperly rejected evidence demonstrates that Wiekamp suffers from a combination of impairments that preclude him from his past relevant work and from any other jobs available in significant numbers in the national economy, or so detracts from any contrary conclusion, that the record as a whole will only support the conclusion that Wiekamp is disabled within the meaning of the Social Security Act.

Therefore, the ALJ's Decision denying benefits is **reversed** and this matter is **remanded** to the Commissioner for the purposes of calculating and paying disability benefits to Wiekamp for a disability commencing on March 28, 1996.

**IT IS SO ORDERED.**